**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

```
UNITED STATES OF AMERICA,        :
                                 :
                                 :
        v.                       :
                                 :    Criminal Action No. 1:05cr12
                                 :
CHARLES E. JOHNSON, JR.,         :
                                 :
            Defendant.           :
_____ :
```

**<u>VERDICT AND OPINION</u>**

By Indictment returned on January 10, 2005, a Grand Jury sitting in the Eastern District of Virginia charged defendant Charles E. Johnson, Jr. a/k/a Junior Johnson ("Junior") with conspiracy to commit securities fraud, securities fraud and witness tampering. Junior's first trial ended abruptly after the Court granted his defense counsel leave to withdraw for ethical reasons. The United States subsequently filed an additional Criminal Information, charging Junior with attempting to obstruct an official proceeding--his first trial--by giving his counsel an altered e-mail to use as evidence. Junior waived a jury, consented to consolidation of the Indictment and Criminal Information, and the matter was tried to the Court.

After considering the evidence introduced during twelve days of testimony (including over 250 exhibits and numerous

stipulations that attach transcripts from other proceedings) and carefully weighing the arguments of counsel, the Court **FINDS** Junior **GUILTY** of all charges against him.  Pursuant to Fed. R. Crim. P. 23(c), the Court states below its specific findings of fact and addresses defense motions to dismiss the Indictment as a matter of law.[1]

## I.  <u>FINDINGS OF FACT</u>

### A.   <u>History of Purchase Pro</u>

Junior Johnson is the principal founder and former Chief Executive Officer of PurchasePro.com, Inc. ("PurchasePro" or the "Company"), a now-defunct internet company that specialized in business-to-business commerce ("B2B").  PurchasePro established and promoted virtual "marketplaces" in which buyers and sellers of goods could interact with one another.  For example, Hilton Hotels--which was one of PurchasePro's largest clients--could use its marketplace to receive bids for towels, sheets and other goods used in running its hotels.  Suppliers who did not previously have a relationship with Hilton could use the marketplace to become part of the hotel chain's supplier list. As originally conceived, such a B2B model allows sellers to find

---

[1] Junior waived his right to be present for the verdict.  <u>See</u> Fed. R. Crim. P. 43(a)(2).

new customers and enables buyers to pay lower prices due to increased competition.

PurchasePro originally sold software to its customers and then charged them a monthly fee for access to PurchasePro's global marketplace.  This was called a "subscription" model.  In the summer of 2000, PurchasePro changed its business model to the sale of a one-time "marketplace license."  The license model allowed users to create their own proprietary marketplaces using PurchasePro software as the engine.  Licensees would also have access to PurchasePro's global marketplace.  The licenses varied in price depending on the number of users that the buyer wished to grant access to its marketplace.  In addition to a one-time license fee, PurchasePro charged its customers hosting and maintenance fees for administering their marketplaces on its computer network.

Junior and his co-founders started PurchasePro in 1996 with loans and investments from a group of individuals who lived in Junior's home state of Kentucky.  After a couple of rocky years, and a second private placement, the Kentucky investors' faith in Junior was rewarded when PurchasePro successfully completed an initial public offering in September 1999.  The IPO raised $48 million.  PurchasePro's stock thereafter soared,[2] and the Company

---

[2]During the year following its IPO, PurchasePro was the second best performing stock listed on the NASDAQ exchange.  At its peak, it had risen 1600% from the IPO price.

3

raised another $250 million[3] in a follow-on offering completed in February 2000.  Although a number of PurchasePro's investors used the soaring stock price and various offerings to reap millions of dollars in gains, Junior did not sell a single share of his stock.  In fact, he purchased an additional $5 million worth of PurchasePro shares as part of the second stock offering.  Junior ended up owning 26-27% of the Company.

Junior viewed his decision to retain PurchasePro shares as a public statement of faith in the future of the Company.  In one of his many appearances on the CNBC business network, Junior announced that neither he nor any member of his executive team would sell a share of PurchasePro stock until the Company was profitable. Only one of the Company's Vice-Presidents violated this pledge, and Junior ostracized him from PurchasePro's day-to-day affairs.

However, the executives' pledge not to sell their PurchasePro stock was not a pledge to live the impecunious lives of struggling entrepreneurs.  As the price of PurchasePro stock soared in 1999 and 2000, Junior and other members of management monetized their stock holdings by pledging them as security for loans.  In connection with PurchasePro's secondary stock offering, Junior obtained a line of credit from Prudential

---

[3]Only $150 million of this total actually went into PurchasePro's coffers.

Securities (the lead underwriter) in the amount of $50 million. He subsequently refinanced this loan with a line of credit from Zurich-based Credit Suisse in the maximum amount of $100 million (although he never actually borrowed this much).  Other PurchasePro executives pledged their shares to banks as collateral for loans.  For example, Executive Vice-President Geoff Layne pledged his shares to Bank One as collateral for a $3.2 million loan.

Although the $100 million to which Junior had access through Credit Suisse is an immense sum in absolute terms, neither party foresaw any difficulty of repayment.  On March 17, 2000, when PurchasePro's stock closed at its yearly high of $75.875, Junior's holdings in the Company were worth over $1 billion.  In addition, Credit Suisse imposed a high loan-to-value ratio.  As a result, the value of Junior's stock would always have to be at least four times his loan balance.  The loan agreement gave Credit Suisse the discretion to sell Junior's shares as necessary to maintain the loan to value ratio.

At the end of 2000, both PurchasePro and Junior appeared to be in great shape.  PurchasePro had 542 employees, $86 million of cash in the bank and had just completed the fourth quarter with revenue far higher than analysts' consensus predictions and its first net profit.  (GX-1.1).  PurchasePro's stock finished the year at $17.50 per share.  (DX-7000).  While the stock price was

down considerably from its high for the year, the Company still had a market capitalization of almost $1 billion.  Junior's shares were worth over $236 million.

However, not all was at it appeared.  Behind the curtain, customers seemed unwilling to pay substantial sums for a marketplace license until the concept became more heavily adopted by other businesses.  In other words, PurchasePro faced a collective action problem.  As a result, PurchasePro had to resort to reciprocal deals to generate much of the revenue booked in the fourth quarter.  Known within the company as "Barney deals,"[4] these transactions required PurchasePro to buy products and/or services from its customers in an amount equal to or greater than the price of the marketplace license.  In essence, the companies were simply trading dollars.  Businesses ordinarily have no incentive to do this because it does not result in any increase in net profit.  However, gross revenue, not net profit, was the metric favored by Wall Street during the internet boom.

Securities analysts began questioning the "quality" of PurchasePro's revenue.  Even more importantly, the company's auditor, Arthur Andersen & Co., had concluded that revenue from

---

[4]Barney the purple dinosaur is a children's character familiar to parents whose offspring are under the age of six. His trademark is a highly annoying song that begins with the verse, "I love you, you love me, we're a happy family." Executives at PurchasePro called reciprocal transactions Barney deals because each side was getting some love.

Barney deals could not be recognized at the time the marketplace license was sold.  Recognition of sales revenue generated by Barney deals had to be deferred until PurchasePro performed its reciprocal obligation.  To enforce this accounting decree, Arthur Andersen required PurchasePro executives to certify in writing that each marketplace license sale did not involve a reciprocal arrangement.

As it headed into the first quarter of 2001, PurchasePro had to change the way it made sales.  The company counted on its relationship with America Online, Inc. ("AOL") to help it make this transition.

**B.   <u>PurchasePro's Relationship with AOL</u>**

During the internet boom of the late 1990's and 2000, AOL was the pre-eminent company in cyberspace.  Tens of millions of consumers accessed the internet through AOL, and the Company was just as dominant as an advertising medium.  Numerous start-up companies sought a business relationship with AOL as a means of gaining credibility in the market.

Junior was one of those who sought to tie his Company's fortunes to the tail of the AOL comet.  His timing was propitious.  In late 1999, when he began negotiations with AOL, the internet giant was planning to introduce a small business website through its Netscape subsidiary.  Numerous companies

wanted to be part of this "NetBusiness" site because they envisioned it as a portal through which many new customers would gush.  These small businesses would want access to B2B resources. AOL selected PurchasePro to provide this service.

AOL and PurchasePro ultimately agreed to co-develop a new generation of PurchasePro's marketplace technology, and to co-develop and market a co-branded marketplace.  This relationship had three major contractual components:

*__Technology Agreement__ dated March 15, 2000.  AOL and PurchasePro agreed that each would contribute technology to the development alliance and co-manage the development of the new marketplace technology.  PurchasePro further agreed to pay AOL $20 million in eight quarterly installments ($2.5 million each) beginning August 1, 2001.  AOL was not obligated to contribute any money, but it promised to contribute programmers to the development alliance.

*__Interactive Marketing Agreement__ dated March 15, 2000.  AOL and PurchasePro agreed to market the co-branded marketplace across AOL's various properties through advertising "impressions."  Advertising on AOL's websites was also known as "carriage."  PurchasePro purchased millions of impressions in exchange for a $25 million immediate payment and seven quarterly payments of $3.57 million each ($50 million total).

*__Warrant Agreement__ dated March 15, 2000.  This contract gave

8

AOL warrants to purchase four million PurchasePro shares at the then-market price of $63 per share.  One million of the warrants vested immediately.  The remaining three million warrants vested as AOL referred certain amounts of revenue to PurchasePro.  The unvested warrants would automatically reprice themselves to PurchasePro's trading price in March 2001.

To summarize, PurchasePro agreed to pay AOL $70 million over a two-year period.  It further agreed to sell to AOL one million shares initially and another three million shares later if AOL referred a large number of marketplace customers.  In return, AOL agreed to allow electronic ads to appear on its network (at a marginal cost of virtually $0) and to contribute unspecified programmers and technology to a marketplace joint venture.  These unequal terms reflected the dominance of AOL's bargaining position, its stock market value as a publicly announced partner[5] and the vast number of new customers that undoubtedly would flow through the NetBusiness portal.

NetBusiness got off to a very slow start.  Its launch was delayed and not well promoted.  As a result, AOL's partners-- including PurchasePro--did not capture the torrent of new customers that they had expected.  To salvage its relationship with PurchasePro, AOL agreed in the fall of 2000 to become a

---

[5] Not coincidentally, PurchasePro's stock hit its yearly high of $75.875 two days after the AOL deal was announced.

customer of PurchasePro and a reseller of its products.  Three
new contacts reflect the changes in the relationship.

   ***Bulk Subscription Sales Agreement** dated December 1, 2000.
AOL agreed to purchase 100,000 subscriptions to PurchasePro
marketplaces for free distribution to AOL's customers.  The cost
to AOL was $4.9 million per month.  Pursuant to this arrangement,
PurchasePro booked millions in bulk subscription revenue for the
fourth quarter of 2000.

   ***Advertising Services Agreement** dated December 1, 2000.  AOL
agreed to act as PurchasePro's agent in selling marketplace
licenses.  It would receive as a commission 50% of the revenue
generated from its sales effort, plus additional warrants to buy
PurchasePro's stock at a discounted price.

   ***Amended Warrant Agreement** dated November 18, 2000.  The
prior Warrant Agreement was amended to further incentivize AOL to
send customers to PurchasePro.  For each dollar of revenue that
AOL referred to PurchasePro (including agency sales), AOL would
receive three dollars in warrants.  In addition, the exercise
price of the warrants was reduced to $0.01 per share.  (GX-29.1).

   Under this new relationship, PurchasePro was paying dearly
to incentivize AOL to sell its marketplace licenses.  Not only
would AOL receive 50% of PurchasePro's licensing fee, but it
would also get triple the gross amount of the sale in stock
warrants.  Using a warrant valuation model known as Black-

Scholes, this arrangement allowed AOL to book immediately as profit the value of the warrants it earned.  In the fourth quarter of 2000, AOL received $30 million in PurchasePro warrants.  (Tr. 1583-84).[6]

## C.  **The First Quarter of 2001**

The sisyphean task of figuring out how to "make" the next quarter customarily fell to Jeff Anderson, PurchasePro's Senior Vice President of Sales and Strategic Development.  In planning for the first quarter of 2001, Mr. Anderson established an initial revenue goal of $50 million.  Of this total, he looked to AOL for $18.9 million.  (GX-610).  The anticipated AOL revenue fell into three categories: AOL sales of marketplace licenses pursuant to the Advertising Services Agreement ($10 million); AOL's purchase of bulk subscriptions pursuant to the Bulk Subscription Sales Agreement ($4.9 million); and revenue generated in connection with a three-way transaction involving AOL, PurchasePro and AuctionNet ($4 million).  As we will see, PurchasePro's dependence on AOL-related revenue continually increased as the quarter played out.

---

[6]AOL reported as revenue to the public only $20 million of this total.  AOL's accountants required that it net out approximately $10 million in products purchased from PurchasePro.

1.   **Sale of Marketplace Licenses**

The AOL sales effort started slowly.  AOL did not sell any marketplace licenses in January 2001.  Nonetheless, PurchasePro remained so confident of AOL's future success that it issued optimistic guidance to the investing public.  During a February 12 conference call to announce fourth quarter earnings, Junior predicted that PurchasePro would earn first quarter revenues of $42 million, a 25% increase over the prior quarter. (GX-3).  Two days later, on February 14, Jeff Anderson circulated a revised Q1 revenue breakdown that increased the AOL sales target to $14 million from $10 million.  (GX-610).

Wall Street did not share Junior's optimism about PurchasePro's future.  On February 5, Barron's magazine published an article entitled "*Worth the Price? With a modest business, PurchasePro has built a large market value.*"  Among other things, the article criticized PurchasePro's "liberal accounting procedures" and inexperienced management.  Three days later, Prudential Securities--the investment firm that took PurchasePro public--downgraded its prior recommendation of PurchasePro stock.  The stock price slid from $28.875 on February 1 to $11.313 on February 29.

As of March 1, AOL still had not sold any marketplace licenses.  This was a major problem for PurchasePro because, as Jeff Anderson succinctly noted in a late February e-mail, "Bottom

line is that we are dead without AOL in Q1 and Q2." (GX-611).
However, AOL's principal salesperson, Neil Davis, assured Junior
that he was "pretty comfortable" with getting $50 million in
sales by the close of the quarter.  (GX-457, DX-1903).  Davis's
assurances led Junior to authorize a press release on March 7,
2001 that reiterated PurchasePro's prior guidance of $42 million
in gross revenue for Q1. (GX-4).[7]

Neil Davis's confidence was based in large part on AOL's
willingness to offer carrots and wield sticks to make the sales.
AOL pressured its existing suppliers to buy a marketplace license
as the implied price of continuing to do business with the
internet giant.  Other prospective customers were enticed with
the prospect of becoming an AOL supplier.  Companies who still
balked were guaranteed a return on the their investment through
side agreements whereby AOL would buy more goods and services
from the company than the price of the license. (D-457).
Finally, AOL was willing to rework its advertising contracts with
existing customers to "make up" the money the customers spent
with PurchasePro.  AOL would either cut the amount it was owed or
would agree to deliver additional advertising impressions at no

---

[7]In addition to the press release, Junior appeared on the
CNBC business network to reiterate the $42 million guidance
figure Q1.  The appearance contravened an agreement that
PurchasePro had made with Arthur Andersen, and Junior made the
appearance over the protests of PurchasePro's President, Shawn
McGhee.

cost.

In authorizing the March 7 press release, Junior overrode objections from many members of management who were not so sanguine about AOL's ability to deliver.[8]  While Junior had Neil Davis's prediction to back him up, he also was under pressure to do something very public.  On Tuesday, March 6, PurchasePro's stock price finally sank to a level that caused Credit Suisse to begin selling some of the shares that Junior had pledged as collateral.  Over a two-day period (March 6 and 7), Credit Suisse sold 1.45 million PurchasePro shares, driving the stock down to $10.25.  The day after the March 7 press release, the stock rose as high as $12.375 per share.  The analysts were "uniformly enthusiastic" about PurchasePro's announcement because all of its competitors were lowering guidance and laying off personnel. (Tr. 50).

The bounce was short lived.  By March 15, PurchasePro's stock had sunk to $9.21.[9]  In addition, AOL still had not sold any marketplace licenses.  Highly concerned about the situation,

---

[8]Prior to the issuance of the March 7 press release, PurchasePro Senior Vice-President, Ed Kim tried to talk Junior into lowering guidance.  Junior responded by questioning Kim's loyalty as an officer of the Company.  (Tr. 48).

[9]As PurchasePro's stock sank, the securities analysts who followed the stock began to downgrade it.  On March 2, Morgan Stanley cut its recommendation from "Outperform" to "Neutral." On March 9, Lehman Brothers downgraded PurchasePro from "StrongBuy" to "Buy."

Junior decamped from Las Vegas to AOL's offices in New York City. He was accompanied by James Sholeff, a PurchasePro Vice-President whose principal job was to serve as Junior's aide-de-camp.  As recounted by Sholeff, the purpose of the trip was to "redneck"[10] AOL into closing the sales of marketplace licenses.  Junior believed that AOL's sales force lacked focus, which he would supply through bully and bluster.

PurchasePro's stock continued to slide during Junior's and Sholeff's first full week in New York (March 19 to 23), closing at $6.594 on Friday, March 23.  Although he was in New York to close the sale of marketplace licenses, PurchasePro's falling stock price caused Junior to spend valuable time trying to avert further sales of his stock.  In an e-mail sent to Credit Suisse on March 19, he implored the Swiss bank to "[p]lease give us a reasonable solution that insures [sic] the bank is secure and at the same time is a plausible solution that won't cause the stock to crater." (GX-52).  Junior represented that PurchasePro's Board of Directors was willing to do "whatever is reasonable" to prevent further sales.  (Id.)  Two days later, on Wednesday, March 21, the Board agreed to loan Junior the money necessary to exercise his vested stock options and deliver the shares to

---

[10]Sholeff testified that "[r]edneck was a term that a few people at PurchasePro used to describe putting a lot of pressure on somebody, basically pestering them into doing something you want."  (Tr. 572).

Credit Suisse as additional collateral.[11]  Since the loaned money went back to PurchasePro immediately to purchase the option shares, it was a cashless transaction.  (Tr. 1270).

The stock slide affected not only Junior, but also most of the executives at PurchasePro.  Like Junior, they had borrowed heavily against their shares.  Particularly hard hit were Mr. Sholeff and PurchasePro's Executive Vice-President, Goeff Layne. An e-mail that Layne authored to a friend on March 20 reveals the desperation that he felt towards the end of the first quarter of 2001.

> I lost another fricking million today and i don't know when it will stop.  this bitch has run me into the ground royce.  i would have never predicted this shit in a million years.  why me bro?  what did i do to deserve this?  if i can leave this bitch with my debt payed off and $5mm in my pocket, i'd move to fargo, north dakota if need be, my brain is so scattered right now, i don't know what is coming or going.  **i will know in 12 days though**.

(DX-361) (emphasis in original).  Sholeff lamented that he "would end up being a shepherd like my grandfather."  (DX-503).   His financial situation became so desperate by Friday, March 23 that Junior had to transfer $250,000 and thousands of his own PurchasePro shares to Sholeff's account to meet a margin call. (DX-526; Tr. 654).

PurchasePro's declining stock price created enormous

---

[11]Also on March 21, Junior sent to Credit Suisse $10 million that he had borrowed from a friend.  The payment was made without any agreement that Credit Suisse would stop selling stock.

pressure to meet Junior's public prediction of a record quarter.
In his trial testimony, PurchasePro's President, Shawn McGhee,
described the atmosphere at the Company during the last two weeks
of March.

> Q:   [S]ay you came in 3.7, 4 million dollars short of
>       guidance, that wouldn't have been the end of the
>       world would it?
>
> A:   Oh, yes, at that point it would have been the end
>       of the world.  I think it would have been received
>       as negatively as if we did 29.  Any miss was a
>       miss.
>
> Q:   Was it your perception that, as you put it, any
>       miss was going to be catastrophic?
>
> A:   Yes, We had gone out and reiterated, Junior
>       specifically had reiterated guidance numerous
>       times.  The Street had challenged that
>       reiteration.  What they were saying was Rome is
>       burning, why are you the only people who aren't?
>       And, you know, that had been supported in numerous
>       ways.  And, you know, we had a short interest in
>       The Street that was very vocal.
>
> . . . .
>
> Q:   What was the atmosphere around PurchasePro that
>       last week of March?  You've described this kind of
>       overhang.  What was the attitude among the senior
>       vice-presidents?
>
> A:   It was pretty dire.  I mean, one of the reasons
>       why the board moved so quickly as they did with
>       the retention bonuses was that they were worried
>       about a mass walk-out.
>
> Q:   Was that a realistic worry?
>
> A:   You had three or four guys that were key to the
>       organization.  Jeff Anderson comes to mind as one
>       who was very vocal.  Boeth was in a similar
>       situation.  Those two in particular were there.
>       The stock was gone.  They had left, you know, mid

17

> six-figure jobs to come to work for PurchasePro
> basically for the stock.  And the stock has no
> value now.  And these guys had worked, you know,
> in some cases months, in some cases years, with
> little or no salary, paying expenses out of their
> own pockets to try and make this company work.
> And there was nothing left.  I mean, you get down
> to if the stock's down and you don't believe it's
> going to come back up, then, you know, I've got to
> feed the kids at some point.

> Q:   Just like commodities, you have to cut your loss
>      at some point?

> A:   Yeah.  I would say, you know, you had Geoff Layne
>      who hit margin call with one of his bank loans and
>      was on the verge of losing his house.  Scott
>      Miller was on the verge of losing his house.
>      Junior's, you know, getting clobbered every
>      direction there was.  It was pretty dire.

> Q:   So is it fair to say there was a lot of pressure
>      to make guidance?

> A:   Unbelievable amounts.

(Tr. 1345-46).  In Jim Sholeff's view, "the tension just kept

getting higher as the quarter drew to a close."  (Tr. 574).

During their stay in New York, Junior and Sholeff set up

operations in a conference room near the office of Kent Wakeford.

Mr. Wakeford was a middle level manager in AOL's Business Affairs

group who reported to Eric Keller, a Business Affairs Vice-

President.  Mr. Wakeford was tasked with the unenviable

assignment of managing Junior and closing the sale of marketplace

licenses.

Despite the rednecking that Junior was inflicting on AOL's

sales force, few deals were being closed.  On the Saturday after

18

his first full week in New York (March 24), Junior sent Myer

Berlow, AOL's President of Sales, an e-mail that emphasized

PurchasePro's vulnerable position:

> I believe we resolved a way for the near term and Q1
> **with the carriage being offered dollar for dollar--**
> going forward with Q2 the meetings are being scheduled
> where the real value can be presented properly to
> create a long term value proposition the exact way the
> ppro sales force currently does allow for both upfront
> fees and to be able to generate the long term recurring
> revenue streams--as the populas is built out all sorts
> of other fee opportunities will then kick in--hope we
> can chat before Monday--**We are really hostage at this
> point to AOL for Q1 and will do whatever it takes--we
> need approx 20-25 to get us both to where we need to be
> for Q1--the pipeline is good but it is gametime and
> deals have to be finished!!**

(GX-751) (emphasis added).  Junior reiterated his anxiety about

the situation in an e-mail sent four days later (Wednesday, March

28) to Kent Wakeford.  He stated:

> Tell me what ppro and myself can do to get thos ima
> deals converted--is neil still getting 5-6 completed as
> he stated yesterday and how can we expedite paperwork
> and money--i am on extended set of calls but will start
> as early as you like tomorrow to make this happen--**FREE
> MARKETPLACE plus addtl carriage should not be that
> difficult**--need names and numbers and either neil,
> keller or myer--**it would devastate this entire
> initiative w/o getting this quarter completed**

(GX-621) (emphasis added).  That same day, Junior sent a similar

e-mail to Eric Keller.

> Jeff [Anderson] is getting them to Kent that details
> every line item and we have slashed it to the bone.  I
> know we will get there by doing whatever it takes.  At
> least next quarter we will be in a poaition [sic] to
> rock!!  Eric, we have bent over backwards and spent
> 10's of millions without hesitation and your help here

> not only will be appreciated we will spend accordingly
> to insure the relationship is kept on a level field.
> We need to start Q2 immediately after we finish to lay
> out the needs to prevent either of us being in this
> position again.  You and I both know that this
> relationship will deliver big in future quarters,
> **however we have to survive Q1**.  Anderson and Kent are
> laying out the numbers and I will be there early to get
> on calls with you, Neil and Kent to get it done.  **The
> numbers we are giving you barely gets us there with
> nothing to spare**.

(GX-752) (emphasis added).  By this point in time, the amount of
sales that PurchasePro expected from AOL had risen to $30
million.  (GX-620).  Anything less than that amount might cause
PurchasePro to miss its quarter.

The sense of urgency that permeates Junior's March 28 e-
mails to Kent Wakeford and Eric Keller undoubtedly was
exacerbated by the continuing fall in PurchasePro's stock price.
The stock closed that day at $6.75, a 77% drop since from its
year-to-date high in January.  The value of Junior's PurchasePro
stock holdings had declined from $395.5 million to $81.3 million
over this period of time--a reduction in his net worth of over
$314 million.

On Friday, March 30, the day before the end of Q1, the
parties assessed the results of AOL's sales efforts.  As
recounted in an e-mail sent by Jeff Anderson, the parties had
closed $9.667 million of marketplace sales and expected to close
another $4.22 million by midnight the next day. (GX-632).  This
total of $13.89 million left PurchasePro well short of the $30

million it thought would be needed to meet the guidance it had given to Wall Street.  Anderson identified five prospective customers who might generate as much as another $15 million in sales.  However, time was running out.

Rather than giving up, Junior redoubled his already manic efforts to find more deals.  One of the companies he reached out to was Office Depot.  It had been an early investor in PurchasePro and currently held warrants to buy additional shares of PurchasePro stock at a substantial profit.  Office Depot also had an AOL advertising agreement that was not generating anywhere near the sales that it anticipated.  It needed help on both fronts, an angle that Junior sought to exploit.

At 5:00 pm on Friday afternoon, Junior sent the following e-mail to Bruce Nelson, the CEO of Office Depot:

> I just left a message and I need to speak with you asap--Bruce.  **there is 5 years of my life and the company at risk.**  please call me at 212-xxx-xxxx or 702-xxx-xxxx-It is urgent

(GX-213) (emphasis added).[12]  The two men talked that evening. According to Mr. Nelson, Junior offered to amend Office Depot's warrant agreement to allow for an immediate cashless exercise and offered to persuade AOL to forgive Office Depot's advertising payment obligations if Office Depot would buy bulk subscriptions

---

[12]In an e-mail to Mr. Nelson sent earlier that day, Junior outlined a proposed business deal and stated **"I just want you to know the level of importance this is for us making our quarter."** (GX-213; Tr. 348).

from PurchasePro.  The offer was worth 2 to 3 cents a share in
Office Depot's earnings.[13]  Mr. Nelson nevertheless rejected the
deal because Junior insisted that the paperwork be backdated two
weeks to reflect a closing in Q1.  (Tr. 351, 364).  Mr. Nelson
testified that Junior sounded "panicked" and "highly concerned."
(Tr. 351).  Junior told Nelson "on the call that he'd sold his
soul and needed [Nelson's] help."  (Id.)  Mr. Nelson further
testified that when he rejected the proposed deal, Junior said he
hoped Nelson never needed a friend like himself.  Mr. Nelson
replied that he (Nelson) hoped he never needed a friend like
Junior.  (Id.)

The stock market had closed for the week by the time Junior
spoke with Mr. Nelson, and the results did nothing to sooth his
anxiety.  PurchasePro stock fell at one point on Friday, March 30
to a low of $6.125, although it rallied a little bit by the end
of the day.

The following day, Saturday, March 31, was the last day of
the quarter.  Several more deals closed that day, including the
sale of a marketplace license to a company named Bigstep.
Bigstep was an unhappy NetBusiness partner that Junior assigned
to Geoff Layne.  (Tr. 943-44).  After much cajoling, Layne
finally got Bigstep to sign a contract to buy a marketplace

---

[13]Two to three cents a share to Office Depot at this time was
the rough equivalent of $10 million.

license for $1.1 million, but the price to PurchasePro and AOL
was steep.  AOL agreed to rework Bigstep's adverting contract to
reduce by $1.4 million its future payment obligations.  Despite
the supposed ban on Barney deals, PurchasePro agreed to buy $1.4
million of goods and services from Bigstep and give it $1 million
in banner ads.  (Tr. 956).  Layne testified that Junior
authorized the reciprocal purchase, but cautioned that it not be
put in writing lest the auditors discover it and refuse to
recognize the Bigstep revenue in Q1.  (Tr. 948-49).  However,
Bigstep insisted on a written commitment.  To get the deal done,
Layne countersigned a Letter of Intent, but post-dated it to
April 19, 2001 so the two transactions would appear unrelated.
(GX-265; Tr. 956-57).  Junior expressly approved post-dating the
letter and directed Layne to keep it a secret.  (Tr. 958).  When
the deal was viewed as a whole, Bigstep netted out ahead by $1.3
million.

Yellowbrix, Inc. of Alexandria, Virginia was another unhappy
NetBusiness partner that Junior assigned to Layne.  (Tr. 943-44).
By the end of Q1, Yellowbrix owed AOL $900,000 for advertising.
Yellowbrix did not want a marketplace license, but agreed to buy
one for $440,000 if AOL excused it from any further obligations
and PurchasePro bought $390,000 of Yellowbrix's good and
services.  A deal was struck on these terms, although
PurchasePro's buying obligation was deferred until well into the

23

second quarter so that the auditors would not connect the two

deals.  The parties signed a marketplace license before the end

of the first quarter, but once again PurchasePro and AOL had

bought a sale. Yellowbrix ended up agreeing to spend $50,000 in

out-of-pocket cash to satisfy a $900,000 debt.  Layne testified

that Junior expressly approved the arrangement.  (Tr. 948).

PurchasePro and AOL were still negotiating marketplace sales

to several other potential customers, including 1-800-Flowers.com

and Monster.com, when the quarter ended at midnight on Saturday,

March 31.  AOL had not brought in enough sales for PurchasePro to

make its quarter.  This sad state of affairs led Junior to send

the following e-mail to Kent Wakeford.

> Kent, I have pd or enabled AOL to recognize 120+
> million dollars and dedicated myself and Jeff Anderson
> 100% to AOL in Q1 and now the rules are changing and I
> am left holding the bag--so far this has been a one-
> sided relationship **and now PPRO will be crushed and it
> will personally cause my world to collapse and my
> family**--I bet on AOL to deliver and because nobody had
> urgency except for the 11th hour PPRO and my world will
> hurt while AOL has collected a fortune from us and been
> give [sic] "everything" that I have **and yet here I am
> on the eve of my life being decimated**
>
> . . . .
>
> **Bottom line is that if we miss everything ultimately
> will hit the fan because of the significance of
> warrants, dollars, and the awareness by the analysts
> and media.**  There is also a huge commitment to the
> companies purchasing these and my commitment to make it
> work that will be in jeopardy when I am not there.
> Lastly, but probably the most important item is the
> future economic opportunity lost to everyone.  I pray
> that this can be resolved **because I do enjoy the**

**relationship and that is why I sold my soul**. Jr
(DX305) (emphasis added).  Even though PurchasePro had not
generated anything close to $42 million in revenue by the close
of business on March 31, Junior told Sholeff, "if anybody asks
you make sure you tell them we made the quarter."  (Tr. 600).

Despite venting to Kent Wakeford, Junior remained unwilling
to concede defeat.  Several hours before midnight on Saturday,
March, 31, Junior sent an e-mail to AOL's President of Sales,
Myer Berlow.  Junior proposed in the e-mail to continue selling
Q1 deals during the first week of Q2.

> Myer, Now I can't sleep until my Q is done--I have
> banked my future on you big guy!!  I trust you and
> would have waited to pay these commissions if it wasn't
> for my trust in you.  The task can be done probably
> only by you and below is the task.
>
> We need flowers, monster and 1.5 more deals and I need
> paperwork for the quarter sent no later than Wednesday
> to receive on Thursday--**PPRO and my entire financial
> future does depend on this, in other words I will be
> wiped out otherwise.**
> Thanks
> Jr
> Acutal Numbers
> 7.4 with monster and flwrs
> 5.55 gap to fill
> ----
> 12.95 total

(GX-760.1) (emphasis added).

Monday, April 2 was the first business day of the next
quarter, and it inaugurated a disastrous week for PurchasePro's
stock.  Credit Suisse began selling more shares of the pledged

PurchasePro stock that Junior had pledged as collateral.[14]
Junior requested that PurchasePro's Board authorize an emergency
loan to him so that he could pay it over to Credit Suisse and
stop the sales.  The Board of Directors considered this request
in a special meeting held on Tuesday, April 3, but it reached no
decision.[15]  The Board met again on Friday, April 6, but once
again deferred acting on Junior's loan request.  According to
minutes of the April 6 meeting, "The Board concluded that without
more definitive information concerning the Company's first
quarter financial results and certain other matters, it presently
was not in a position to make a decision on whether it could
assist Junior."  (GX-35).

By week's end, Credit Suisse had sold 2.3 million shares of
PurchasePro stock,[16] and its price sank to a record low of $2.93
per share.  The value of Junior's stake in PurchasePro shrank
over the course of the week by another $54 million (to $32.9
million).  The sorry state of the Company's credibility on Wall

---

[14]Also on Monday, April 2, Geoff Layne advised Bank One that
he could not post additional collateral to satisfy the terms of
his loan agreement and was in default.  (DX-1550).  The record
does not reveal whether Bank One sold any of the shares that
Layne had pledged during the week of April 2.

[15]Also on April 3, Credit Suisse First Boston (a subsidiary
of Credit Suisse) downgraded PurchasePro's stock, and Wedbush
Morgan recommended that its clients sell the stock.

[16]Credit Suisse sold another 830,000 shares on April 9 and 10
of the following week.

Street was reflected in an e-mail that Junior received on
Wednesday, April 4 from a stock analyst at Lehman Brothers:

> Jr,
> I'd be grateful if you could give me a call when you
> have a few minutes.  I would like to hear from you that
> there will be no more deals involving non-monetary
> assets or liabilities, no more warrants deals, no more
> revenue from companies you have an investment in.  If
> it means you have to miss my projections or bring down
> guidance—that's fine with me.  At $3, its clear no one
> believes the projections anyways.  We need to clean
> this story up so that people can judge it on the
> fundamentals.
>
> Patrick Walravens
> Vice President
> B2B Equity Research Analyst
> Lehman Brothers

(DX-410).

Despite these distractions, Junior continued to "redneck"
Kent Wakeford and others to close the sale of marketplace
licenses during the week of April 2.  The sale to 1-800-
Flowers.com referenced in Junior's March 31 e-mail to Myer Berlow
fell through when that company tried to recut the deal to exploit
PurchasePro's vulnerability.  The parties did manage to sell a
$3.7 million marketplace license to Monster.com on Wednesday,
April 4, but had to turn it into a Barney deal in order to close
the transaction.  PurchasePro assigned to Monster $6.2 million of
the advertising impressions that it previously had purchased from
AOL pursuant to the Interactive Marketing Agreement.  When the
two obligations were netted against each other, Monster came out
ahead by over $3 million.  The Monster marketplace license was

dated March 31, 2001, even though it was not signed until April 4.[17]

During the first week of April, Junior admitted to Ed Kim that he was still selling Q1 deals. (Tr. 61). Similarly, Junior told Jeff Anderson that AOL had committed to deliver Q1 contracts to PurchasePro during the first week of April. (Tr. 408). On a conference call with several PurchasePro executives, including Mr. Kim, "[Junior] told us not to worry, that the quarter ends when I say it ends, not when the calendar says it ends." (Tr. 64).

### 2.   **Bulk Subscriptions**

As discussed above, AOL had purchased 100,000 one-month subscriptions to PurchasePro's Global Marketplace for the month of December 2000 at a cost of $49 per subscriber. ($4.9 million total). AOL distributed the subscriptions to its NetBusiness customers as a way of promoting the B2B platform that it and PurchasePro were developing jointly. The purchase was documented in the Bulk Subscription Sales Agreement.

The Bulk Subscription Sales Agreement gave AOL the option of purchasing bulk subscriptions for additional months on the same terms and conditions. To exercise this option, AOL had to notify

---

[17]PurchasePro claimed the Monster.com marketplace license sale as Q1 revenue, but AOL listed the deal as Q2 revenue in its own internal spreadsheets.

PurchasePro no later than five days after the beginning of the month.  AOL gave verbal notification for the months of January and February, 2001, thereby ordering $9.8 million of additional subscriptions that PurchasePro dutifully made available to AOL's customers.  However, because the Bulk Subscription Sales Agreement technically had expired, AOL and PurchasePro had to execute a written contract Amendment to make AOL's exercise a binding obligation.

AOL dragged its feet on signing an Amendment to the Bulk Subscription Sales Agreement.  In an e-mail to Kent Wakeford dated March 15, 2001, Jeff Anderson reminded Mr. Wakeford that PurchasePro still had not been paid $4.9 million for the subscriptions AOL distributed in December.  He also stated, "Need you to execute the Q1 prepaid subscription agreements --- including the renewal option from the Q4 contract ($4.9M) and the addendum that Wiegand sent you two weeks ago (an additional $4.9M)--- we'll need payment on the full $9.8M by 3/30 as we manage our cash position" (GX-1410).

By the end of the last week of March, AOL still had not executed the Amendment, and Junior was becoming frantic about the situation.  He and other senior PurchasePro executives knew that Arthur Andersen would not recognize the bulk subscription revenue in Q1 unless there was an Amendment signed before the end of the quarter.  The $9.8 million that AOL verbally had agreed to pay

was approximately 25% of PurchasePro's projected revenue and losing it would cause PurchasePro to fall well short of the revenue guidance it had given to Wall Street.  However, AOL was concerned about its own quarter.  While AOL was at this time a huge company with over $40 billion in annual revenue, its executives were worried about the reduction in gross income[18] that necessarily would follow from paying (or obligating itself to pay) $9.8 million to PurchasePro in Q1.  PurchasePro was not the only company that needed to meet or beat Wall Street expectations.

As part of the complicated, symbiotic relationship between AOL and PurchasePro, Junior had promised Myer Berlow that PurchasePro would deliver, before the end of the first quarter, a check for the commissions that AOL had earned on marketplace sales during the quarter.  AOL was counting on this revenue to make its own projections.  In happier times, the parties had estimated the commission amount to be $12.2 million (which assumed AOL would generate sales of $24.4 million).

On the afternoon of Saturday, March 31, Junior decided to use this promised commission payment as leverage to extract a signed Amendment to the Bulk Sales Agreement.  After waiting all day for Eric Keller to fax back a signed Amendment, Junior took

---

[18]AOL's accountants required that it reduce its gross revenue from PurchasePro by the amount of goods/services that AOL bought from PurchasePro.

back a $12.2 million check he previously had given to Kent
Wakeford and announced that he would keep it until he received
the signed Amendment.  He then left AOL's offices and went
incommunicado.  This enraged Myer Berlow who was counting on
receiving the $12.2 million by the end of Q1.  Mr. Berlow was in
Mexico on vacation.  He directed that Kent Wakeford, who was on
the ground in New York, send Junior the following e-mail message.

> myer says he's knee deep in blood and you're pissing on
> his head -- myer's been on the phone screaming at
> people on your behalf.  he's flying in tomorrow and
> coming straight to your hotel -- as he says, you better
> tell him your hotel room or he will knock on fucking
> every door.

(GX-651).  After receiving this message, Junior forwarded it to
certain PurchasePro executives (including Sholeff, Layne and
Anderson) with the caption "The game of chicken proceeds."  (Id.)
Several hours later,  Junior asked Eric Keller by e-mail, "Where
is my signed document--I will keep this check...till my signed
copy is faxed prior to midnight!" (GX-760).

Junior finally relented and gave the $12.2 million check
back to Kent Wakeford late Saturday evening.[19]  He told Jim
Sholeff that he gave the check to Kent Wakeford to "get AOL
pregnant" and thereby obligate it to continue selling Q1 deals

---

[19]On Monday, April 2, Junior told Kent Wakeford that he had
stopped payment on the check.  He gave Mr. Wakeford a second
check for $12.2 million.  (GX-901).  The second check was dated
March 30, 2001 and the memo line was blank.  By contrast, the
memo line on the first check said "Commissions."

after the end of the quarter.  (Tr. 585-86).[20]  The plan was
further revealed in a subsequent e-mail to Myer Berlow.  Junior
stated:

> Myer, Now I can't sleep until my Q is done--I have
> banked my future on you big guy!!  **I trust you and
> would have waited to pay these commissions if it wasn't
> for my trust in you.**  The task can be done probably
> only by you and below is the task.

(GX-760) (emphasis added).  Junior went on to outline the plan
for post-Q1 sales that is discussed above.

Nothing more happened on the bulk subscriptions issue until
Thursday, April 5.  Jim Sholeff was sitting in an AOL conference
room that day when Eric Keller came in and dropped off a blue
file folder that contained two letters.  The first letter was
appended to an Amendment to the Bulk Subscription Sales
Agreement.  The Amendement was dated March 31, 2001 and signed by
Mr. Keller.  However, the letter itself stated:

April 5, 2001

Dear Jim:

> I am enclosing a copy of the Amendment, **which we
> have signed today.**  It is our understanding that the
> Promotional Subscriptions, which are the subject of
> this Amendment, have been active in January, February
> and March.

Sincerely,
/s/
Eric L. Keller

---

[20]Junior later told Sholeff that AOL had, in fact, agreed to
deliver Q1 contracts after the end of the quarter.  (Tr. 592).

(GX-558) (emphasis added).  Sholeff gave the letter to Junior, who remarked upon reading it, "Nice try, Eric."  (Tr. 619, 621).

The second letter from Mr. Keller addressed the $12.2 million commission check.  It stated:

April 5, 2001

Dear Jim:

We are in receipt of your commission check for $12,200,000.  We have received referral letters with respect to $6,700,000 of commissions earned.  You have assured us that we have earned a total of $12,200,000 in commissions and paid us accordingly.  We look forward to receiving the documentation confirming the additional marketplace sales on which AOL has earned the remaining commissions as soon as possible.

Sincerely,
/s/
Eric L. Keller

(GX-861).  Sholeff put both letters in his briefcase and left AOL's offices.  Upon getting in the limousine for a ride to the hotel, he remarked to Junior's girlfriend, "I don't want to know how many SEC regulations I broke today."  (Ex. F to Oct. 24, 2007 Stipulation).  She described Sholeff as despondent.

### 3.   **AuctionNet Statement of Work**

In December 2000, AOL and PurchasePro negotiated a partnering arrangement with a company called AuctionNet.  The success of eBay had alerted the internet community to the power of auctions as a method of doing business.  AOL wanted an auction function for its NetBusiness site and PurchasePro wanted to be

able to offer auctions on its global marketplace.  Rather than develop the technology themselves, AOL and PurchasePro turned to a company named AuctionNet.  The parties entered into a three-way deal that is described below.  Not surprisingly, Barney the purple dinosaur was integral to the arrangement.

In December 2000, AuctionNet purchased two PurchasePro marketplace licenses and related services that it did not want for $3.2 million.  This was the price of doing business with AOL, but it was a price AuctionNet was willing to pay in order to gain credibility in the marketplace.  That same month, PurchasePro agreed to pay AuctionNet $5 million for a license to use its technology on PurchasePro's global marketplace and related fees.  AuctionNet used the $5 million to fund an arrangement with AOL whereby it purchased a position as the preferred provider of auction services on AOL's NetBusiness site.  AuctionNet made a $1 million payment initially to AOL and agreed to pay the remaining $4 million over time.  Finally, on January 18, 2001, AOL amended the existing Advertising Services Agreement with PurchasePro to allocate to PurchasePro the $4 million in future payments that it was to receive from AuctionNet.  (GX-2303).  The $4 million was to cover "integration," which the Amendment defines as the insertion of **advertising** (rather than technology) on the PurchasePro website.  AuctionNet would pay the $4 million over time, and AOL would pay PurchasePro as it was paid.

34

The net result of this tripartite arrangement was that AuctionNet committed to pay $3.2 million, PurchasePro received a net benefit of $2.2 million and AOL would pocket $1 million. PurchasePro reported the AuctionNet marketplace license sales ($1.76 million) as revenue for the fourth quarter of 2000.

To take advantage of the AuctionNet functionality that it had licensed, PurchasePro needed to "integrate" the functionality into PurchasePro's own platform, which serviced both its Global Marketplace and the NetBusiness Marketplace.  This type of integration involved synchronizing technologies so that a visitor to PurchasePro's marketplaces could purchase items at an auction hosted by AuctionNet or, in the future, could offer items for sale by auction.  Matt Sorensen, a lower level PurchasePro marketing executive, was tasked with coordinating the integration efforts.  As part of his responsibilities, Sorensen prepared a Statement of Work dated February 5, 2001.  This document outlined the technology tasks to be performed.

When it became apparent during the last week of March that AOL's sales efforts would fall short, Kent Wakeford and Junior began looking for ways to make up the looming revenue gap.  One of them raised the subject of the AuctionNet revenue that had been set aside for PurchasePro's benefit.  The payment of this money ostensibly would be triggered by PurchasePro satisfying the January 18, 2001 Amendment to the Advertising Services Agreement.

(GX-2303).[21]   Junior called Layne and asked him to shepard

through the system all necessary documentation (Tr. 959-60).

PurchasePro's general counsel, Scott Wiegand, opined that

the Company's audit trail would require a document that justified

AOL's payment.  Since Sorensen already was coordinating the

technological integration of AuctionNet, the task of preparing

payment documentation ultimately was delegated down to him.

Sorensen used the February 5 Statement of Work as a template and

added a section from the AOL/AuctionNet agreement (also known as

the Extended Insertion Order) and language from an internal AOL

document that had been forwarded to PurchasePro.  Finally, he

added signature and date lines for AOL and PurchasePro.

The resulting amalgam contained no price or payment terms.

Read literally, the document allowed AOL to approve payment to

PurchasePro for doing nothing more than conceiving of how to

integrate the two technologies (rather than inserting

advertising), something PurchasePro apparently had already done.

To add to the confusion.  Sorensen also called his new document a

"Statement of Work" ("SOW") and left the cover date the same--

February 5, 2001.

As noted above, the amount that AOL would pay PurchasePro

was not specified in initial drafts of the second SOW, nor was

---

[21]The January 18, 2001 Amendment only required that
PurchasePro insert AuctionNet advertising into its website.

the timing or manner of payment.  In financial modeling done around the end of the first quarter, the parties initially contemplated a payment of $1 million.  (See, e.g., GX-641.1). However, the final signed version of the second SOW quantified AOL's obligation as $3.7 million, payable all in the first quarter rather than over time.  See infra p.46.

## D.   **Covering the Tracks**

### 1.   **Altering Contracts**

Junior, like all senior PurchasePro executives, was very conscious of the documentation that Arthur Andersen required for revenue recognition purposes.  One item of documentation required in every case was a copy of the contract upon which the claimed revenue was based.  Arthur Andersen required that the contract be signed and dated prior to the end of the quarter.  This presented a problem with respect to those sales made and/or contracts received after March 31.

One such contract involved an AOL customer named China.com, Inc.  AOL and PurchasePro sold a marketplace license to China.com prior to the end of the quarter.  China.com signed the contract prior to March 31 (DX-1901, 1903) and wired full payment ($3.7 million) to AOL before the end of the quarter.  (DX-1900). However, AOL did not actually receive the signed China.com

37

contract by fax until Tuesday, April 4.  Out of concern about what the auditors might say, Junior directed Sholeff to clean up the contract so that it looked like it was received before the end of the quarter.  (Tr. 601, 771).  Sholeff added to the contract in his own handwriting a date (March 31) and China.com's address.  He then created a photocopy that hid a post-it note showing the original fax transmission date.  Finally, at Junior's direction, Sholeff reprogrammed a fax machine in AOL's offices to show a date/time stamp of March 31.  He faxed the altered contract to Layne who signed it and back dated his signature. (Tr. 602-07).  Layne then placed the altered China.com contract into PurchasePro's files for the accountants to review at a later date.

Sholeff followed a similar procedure with respect to the Marketplace License sold to Monster.com.  As discussed above, that deal was not finalized until Wednesday, April 5.  The contract was backdated to March 31, 2001 and then run through the altered fax machine to make it seem as though AOL had received the contract on March 31.  (Tr. 607).  Once again, Layne signed the contract and placed it in PurchasePro's files.

Sholeff testified that Junior told him to use several different copy machines when altering the contracts because copy machines leave a signature that can later be traced.  (Tr. 628). Sholeff further testified that he reprogrammed the AOL fax

38

machine at Junior's direction and that Junior looked over his shoulder as the reprogramming took place.  (Tr. 605).

### 2.  **Deleting E-mails**

While Sholeff was busy altering contracts at Junior's direction, Junior was taking steps to ensure that his incriminating e-mails did not see the light of day.  On Monday, April 3, while still in New York, Junior called Ed Kim and Junior directed him to have the IT Department erase from PurchasePro's server all e-mails sent and/or received by Junior, Sholeff, Layne, Chris Hammond and Stephanie Gulley (Junior's secretary). Junior told Kim "that there were passages in those e-mails that nobody should see."  (Tr. 104).[22]

Kim testified that Junior's request made him uneasy, so he consulted with Scott Wiegand.  He then called Todd Morrisette, who served as PurchasePro's Director of IT Infrastructure.  Kim gave the deletion order.  Morrisette wrote down in his Day Planner the individuals for whom e-mails should be deleted (GX-1276) and performed the task.[23]  Kim asked that Morrisette keep

---

[22]Junior later told Layne that he had tried to get e-mails deleted from PurchasePro's computer system.  (Tr. 995).  Layne testified that some e-mails he needed for legitimate projects had been deleted.

[23]Before deleting the e-mails, Morrisette consulted with PurchasePro's Senior Vice-President of Technology, Mike Kennedy. They decided to proceed with the deletions since PurchasePro's back-up tapes would preserve the supposedly deleted documents.

the deletion request confidential.  Junior later asked Morrisette if he had "taken care of the request from Mr. Kim."  (Tr. 1858-59).[24]

Junior apparently felt uneasy about the situation because he also ordered Sholeff to have PurchasePro's IT department delete the same e-mails from the server.[25]  (Tr. 643, 777-80, 829).  Junior gave this directive in his office at PurchasePro during the second week of April after returning from New York.  Junior told Sholeff to explain, if asked, that Junior was embarrassed about having received sexually explicit e-mails.  (Tr. 643).


E.    **Verifying the Claimed Revenue**

Junior abandoned his Q1 sales efforts on Thursday, April 5. He flew home to Las Vegas the next day on his private jet, accompanied by his girlfriend and Jim Sholeff.  Sholeff described Junior as "angry" and "very upset" because PurchasePro had missed

---

However, they agreed to keep the existence of the back-up tapes secret.

[24]Deletion of e-mails from PurchasePro's server did not affect the e-mails that Junior had stored in PST files on his personal computer, e-mails stored in his Blackberry or e-mails stored in his laptop.  Only Junior had access to the e-mails stored in these machines.

[25]Sholeff testified that after receiving Junior's directive, he went to the IT building and asked with Todd Morrisette to delete e-mails from the server.  (Tr. 779, 829).  Mr. Morrisette testified that he does not recall speaking with Sholeff about deleting e-mails.  (Tr. 1883).

its quarter.  (Tr. at 623).  At a refueling stop in Dallas,
Junior called John Chiles, one of PurchasePro's directors, to
advise him that PurchasePro would miss its guidance by $3
million.  (Tr. 1376).[26]  Nonetheless, Junior told Sholeff to
remain upbeat in public and tell anyone who asked that
PurchasePro had made its quarter.  (Tr. 623-24).

Later that evening (Friday, April 6), Junior called Sholeff
and Lane to advise them that he had figured out a way to save
PurchasePro's first quarter.  Junior told them to meet him the
next morning at a local eating establishment called the Bagel
Cafe.  (Tr. 624).  Junior then called Mr. Chiles back to explain
that further review of the numbers revealed that PurchasePro had
made its quarter after all.  (Tr. at 1377).

Junior did not explain his scheme in the late night
telephone calls to Layne and Sholeff.  However, as we will see,
the plan involved manipulating Arthur Andersen's revenue
recognition protocols.  This would simply be the latest
installment in a long and unhappy history between Junior and
PurchasePro's auditors.

Junior nursed numerous grievances against Arthur Andersen.
He believed that Arthur Andersen had misled PurchasePro about its

---

[26]This was the first Mr. Chiles had heard of an actual or
potential shortfall.  He talked to Junior repeatedly in late
March and during the first week of April.  Junior constantly
assured him that PurchasePro would meet its guidance.  (Tr. 1363,
1369).

ability to recognize revenue immediately when PurchasePro switched from a subscription model to a license model in the summer of 2000.  He also faulted Arthur Andersen for missing the deadline to sign off on PurchasePro's 10Q report for the second quarter of 2000.[27]  Junior wanted to fire Arthur Andersen and publicly humiliate the accounting firm during one of his numerous appearances on CNBC.  PurchasePro's Board of Directors overruled him on both courses of action.  There were no national accounting firms available to take Arthur Andersen's place, and PurchasePro needed the credibility that a "Big 5" firm brought to the table.

Arthur Andersen had its own problems with Junior.  The accountants found him overbearing and manipulative during the revenue recognition process.  After Junior threatened an Arthur Andersen accountant in the fall of 2000, the firm resigned. PurchasePro's Board persuaded the accounting firm to reconsider, but Arthur Andersen imposed certain conditions.  One of those conditions was to ban Junior from any involvement whatsoever in the revenue recognition process.  All of PurchasePro's internal revenue recognition decisions henceforth would be made by a committee consisting of Shawn McGhee, Scott Wiegand and the Company's Chief Accounting Officer (Scott Miller).  This troika would decide which sales to claim as revenue in a particular quarter.  Arthur Andersen would either bless their decisions or

---

[27]Junior claims that Arthur Andersen missed the deadline because its accountants were at a golf tournament.

not.

Junior had played fast and loose before with PurcahsePro's revenue recognition procedures, but the plan that he outlined at the Bagel Cafe on the morning of Saturday, April 7 was a quantum leap in deception.  The plan involved working the differential between AOL's first quarter reporting date (April 18) and PurchasePro's scheduled reporting date (April 25).  Junior was convinced that Myer Berlow, Eric Keller and his other friends at AOL would be willing to help PurchasePro once AOL had reported its first quarter earnings.  (Tr. 975-76).  Because the PurchasePro transactions were such a small part of AOL's overall revenue, Junior believed that the internet giant would not have to correct officially its Q1 earnings announcement to reflect the adjustments he had in mind.  (Tr. 639).  If Junior, Layne and Sholeff could make certain items of revenue appear viable until April 19, Junior believed that the AOL executives would bless the changes he had made in time for PurchasePro to meet its earning guidance on April 25.  (Tr. 1194).

The two areas in which Junior planned to gain revenue were the second SOW and the amount of commissions that PurchasePro paid to AOL for selling marketplace licenses.  With respect to the former, Junior asked Layne to forge Eric Keller's signature on the SOW.  To facilitate the forgery, either Sholeff or Junior handed Layne the blue folder that contained Eric Keller's April 5

43

letter regarding application of the $12.2 million commission check.  (Tr. 978, 1199).  Junior told Layne that Keller's "would never see the light of day," so he could lift Eric Keller's original signature from it and put it on the SOW.  (Tr. 979, 1195).  Junior promised that Keller would sign this document once AOL reported its earnings on April 18, and the forgery would be removed from PurchasePro's files.  (Tr. 977, 983).

With respect to commissions, Junior planned to cut AOL's commission rate from 50% to 20%.  This was just below the percentage that would require PurchasePro to offset the commission payments against the gross amount of marketplace license revenue.[28]  To fool the auditors until April 18, the conspirators needed to change the paperwork surrounding the two $12.2 million checks that Junior gave to Kent Wakeford.  Eric Keller had already claimed for AOL the benefit of the entire amount in his April 5 letter.  However, Junior had sole possession of this letter and would not show it to the auditors.

The $12.2 million check itself presented a more difficult problem.  The check that Junior gave to Kent Wakeford on the night of March 31 (No. 14808) contained the notation "Commissions" on the memo line.  (GX-900).  The stub originally

---

[28]Arthur Andersen required that PurchasePro deduct from gross revenue any commissions it paid in excess of a customary commission percentage.  No one knew exactly what percentage Arthur Andersen would deem customary.  Junior assumed the cutoff was 20-25%.

attached to Check No. 14808 bore the same notation.  (GX-900.2)
However, Junior had the foresight to substitute checks on Monday,
April 3.  The new check that he gave to Kent Wakeford (No. 14809)
contained no notation concerning the purpose of the payment and
neither did the stub originally attached to it.  (GX-901).
Junior planned to alter the stub for Check No. 14809 to state
that the $12.2 million payment covered a number of things,
including only $3.7 million in commissions.

The $6.7 million in top-line revenue generated by these
changes allowed Junior to claim that PurchasePro had earned
$42,550,550 in gross revenue during the first quarter of 2001.
This number and a breakdown of its component parts were submitted
to PurchasePro's Board for use at its meeting held on Tuesday,
April 10.  (GX-37, 37.1).  Among other topics, the Board
reconsidered at this meeting the long discussed loan to Junior to
ameliorate the default in his loan from Credit Suisse.  "[B]ased
on many factors, **including the company's financial performance**,
the Company's performance compared to its competitors and
discussions with industry experts"  the Board voted to pay Junior
a $2 million bonus and reimburse him for $1 million in previously
unclaimed expenses.  (GX-36) (emphasis added).  The Board would
not have authorized the $3 million payment to Junior but for
management's assurance that PurchasePro had met its Q1 earnings
guidance.  The Board's previous plan to loan Junior $3 million

45

was scrapped because Arthur Andersen threatened to resign if the loan was made.  However, the accounting firm blessed the bonus/reimbursement arrangement.

The $3 million that Junior received from PurchasePro was wired directly to Credit Suisse and used to reduce Junior's loan balance.  The infusion of funds was timely.  On Monday, April 9 and Tuesday, April 10, Credit Suisse sold another 830,000 shares of Junior's stock, thereby further depressing PurchasePro's trading price.  Credit Suisse stopped selling (albeit temporarily) after receiving the $3 million wire.  PurchasePro's stock price stabilized at between $4 and $5.

Meanwhile, back at the office, Sholeff and Layne were busy forging documents during the week of April 9.  Using an exacto knife, Layne lifted Eric Keller's signature from one of the April 5 letters and placed it onto a suitably modified version of the SOW.  He then forged the signature of Mike Kennedy, PurchasePro's Senior Vice-President of Technology.  Layne did this by lifting Kennedy's signature from an earlier version of the second SOW that did not contain any payment or completion terms and placed it on the final version which contained these terms.  (GX-1802.2).  Layne had previously asked Junior what price term to put in the SOW.  Junior told him to charge AOL $3.7 million, and make it payable immediately.  (Tr. 982).  Junior pronounced himself impressed with the way Layne had managed to make Keller's

forged signature look especially realistic by extending part of the signature below the signature line.  (Tr. at 632-33, 982).[29] He told Layne to put the forged SOW into the internal audit file and give a copy to Scott Miller.  (Tr. 983).

The trio also altered the stub originally attached to Check No. 14809 to make it conform to Junior's recharacterization of the payment.  Junior made the alterations in his office in the presence of Sholeff.  (Tr. 630).  He added the following notations:

        3,500,000---Carriage
        3,700,000---Commissions
        5,000,000---Pre-Pymt AOL/To Adv.

(GX-903).  Junior directed Sholeff to make copies of the altered check stub.  (Tr. 630).

By the end of the week of April 9, Junior, Layne and Sholeff had salted PurchasePro's files with most of the false information necessary to carry out the Bagel Cafe scheme.  In addition to the forged SOW and the altered check stub, Layne falsely certified in writing that the Monster, YellowBrix and Bigstep sales did not involve any side agreements.  The files also contained the Monster and China.com contracts, both of which bore altered fax

---

[29]The forged SOW prompted PurchasePro's accounts receivable department to send AOL an invoice dated April 16, 2001 in the amount of $3.7 million.  (GX-1802.2, DX-2011).  It also prompted Arthur Andersen to send AOL a request to confirm that it owed PurchasePro $3.7 million for integration services performed during Q1.  AOL denied this obligation in Joe Ripp's letter of May 14, 2001.  See infra at p.59.

headers and inaccurate execution dates.  Everything was in place
for AOL to do its part.

Although the Bagel Cafe scheme appeared to be proceeding
according to plan, Junior wanted to cover his tracks further.  He
removed documents from the offices of Scott Wiegand and Scott
Miller.  (Tr. 996).  He also directed Layne and Sholeff to
destroy all documents related to their dealings with AOL.  (Tr.
643-44, 994).  Junior brought his AOL documents over to Sholeff's
house for disposal.  Sholeff shredded the documents and then
burned the strips of paper.  Sholeff and Layne also destroyed
their laptops at Junior's direction.  (Tr. 644, 995).  All e-
mails from late March and early April already had been deleted
from the PurchasePro server pursuant to Junior's directive to Ed
Kim on April 3, but duplicate versions might be on the laptops.
Sholeff pulverized the hard drives contained in his and Layne's
laptops.  He then buried the ashes and the parts in his backyard.
Junior told Sholeff that "he was particularly impressed with the
burning and raking into the dirt part."  (Tr. 644).

On Wednesday, April 18, AOL reported earnings that met Wall
Street expectations.  Junior planned to talk AOL into the changes
he had made at a scheduled meeting to be held two days later in
AOL's New York offices.  However, as a precaution, Junior and
Sholeff went to AOL's offices on Thursday, April 19 to fax
several pieces of blank paper to Layne at PurchasePro's offices

48

in Las Vegas.  (Tr. 637-38).  These could be used to create
convincing false confirmation letters from AOL.  Everyone hoped
this would be unnecessary.

The meeting between AOL and PurchasePro was held as
scheduled on Friday, April 20.  However, it devolved into mutual
recriminations over each party's culpability for the business
disaster that occurred during the last weeks of March and first
week of April.[30]  Junior left New York with no help from AOL.  He
told Layne of his lack of success with AOL.  (Tr. 997).  Layne
testified that he "was in disbelief" (Tr. 1201) and realized that
he had been left "holding the bag on the [forged] signatures."
(Tr. 1202).

The final piece of the Bagel Cafe puzzle was AOL's
confirmation of how it had allocated the $12.2 million payment.
Scott Miller had drafted a letter for AOL to send that met Arthur
Andersen's requirements.  Junior reviewed this letter and found
it too specific.  As Layne explained it, Junior "wanted to have
some wiggle room, in case he needed to, because he was still
working out some details of the quarter, I think, and he didn't
want to put numbers on it."  (Tr. 989).  Junior told Layne how
the letter should be modified.  (Id.)  Layne made the changes and
copied the finished product onto AOL letterhead that Sholeff had

---

[30]Prior to the April 20 meeting, Junior traded e-mails with
David Coburn, the President of AOL's Business Affairs unit.  Each
accused the other of dropping the ball.  (GX-2244).

brought back from New York.  He then copied the AOL letterhead version onto one of the blank sheets of paper that Sholeff and Junior had faxed from New York on April 19.

The letter created by Layne read:

April 19, 2001

Mr. Scott Miller
Senior Vice President-Finance
PurchasePro.com, Inc.
3291 North Buffalo Drive
Las Vegas, NV 89129

Dear Scott:

This letter serves to confirm the application of your $12,200,00 payment made to us by check number 14809 dated March 31, 2001.  The payment was for three separate entities.

- Sales commissions for the quarter ended March 31, 2001

- AOL/TW Promotional Agreement dated January 30, 2001

- Quarterly payment due under the Interactive Marketing Agreement on March 15, 2000

Upon the execution of this check we were unaware of the wire transfer that occurred on April 2, 2001 for the Interactive Marketing Agreement referred to above.

We acknowledge that this represents an overpayment and the amount due and should have been included in the $12,200,000 noted above.

We will have a representative call you within the next few days to discuss how you wish to handle the extra payments that were made.  If you have any further questions, please contact me at your earliest convenience.

50

                              Sincerely,

                                /s/
                              Eric Keller
                              SVP Business Affairs

(GX-773).  Once again, Layne forged Keller's signature by lifting

it from one of the April 5 letters.  The fax date/time stamp

showing that the letter came from AOL on April 19 lent it extra

authenticity.  Junior told Sholeff to take the letter to Scott

Miller on Monday, April 23 and say that someone had mistakenly

put it into his inbox while he was in New York.  (Tr. 639).

     PurchasePro's accounting department unexpectedly required a

second letter from AOL.  This one needed to itemize the

marketplace licenses that AOL sold in Q1 and the amount of

commissions it claimed.  Once again, Layne created a fictitious

letter from Eric Keller. (GX-774).  This letter, which was dated

April 23, 2001, credited AOL with sales of $17,324,000 and stated

that AOL was due a commission of $3,700,000.  Junior told Layne

to use the $3.7 million commission number.  (Tr. 992).  The

number represented 21% of sales--a percentage roughly consistent

with Junior's unilaterally revised commission rate.  To get to

this percentage, Layne had to credit AOL with several sales that

it did not make.  The $3.7 million commission number also matched

the amount recorded on the stub formerly attached to Check No.

14809.  As before, Layne also forged Keller's signature.

However, he had no more genuine letters from which to cut out

                                    51

Keller's signature, so he forged the signature freehand.   The result was somewhat sloppy, and Layne worried that the forgery might be discovered.   (Tr. 640-41).   Junior told him not to worry because the letter would just go into an audit file and never be seen again.   (Tr. 642, 808).

Layne was right to worry.   Scott Wiegand was highly suspicious of the transactions involving AOL.   He initially questioned whether Eric Keller had signed the April 19 letter. His suspicions were triggered in part by an incident where he walked in Layne's office and thought he saw Layne altering a document.   Wiegand compared Keller's signature on the April 19 letter to his signature on the second SOW.   The two signatures were identical.   At a subsequent Senior Vice-Presidents meeting, Wiegand accused Layne of forgery, which Layne indignantly denied. The two men had a heated confrontation that ended inconclusively.

Wiegand did not let the issue drop.   He kept complaining to Shawn McGhee that the AOL-related transactions were not genuine. Finally, on Monday, April 23, McGhee had heard enough. PurchasePro was scheduled to report its Q1 results in only two days and the Company's general counsel kept insisting--albeit without any real proof--that substantial amounts of claimed revenue were bogus.   McGhee decided to call Eric Keller to get direct verbal confirmations.   He had been reluctant to take this step before now because Junior prohibited anyone other than

himself from talking to AOL about the relationship between the two companies.  However, McGhee had already told the Board of his plan to resign as President.  As a result, he did not fear getting fired by Junior.

In his initial call to Eric Keller, McGhee remained purposefully vague because he did not want to reveal to a major business partner that PurcahsePro might have a forger in its midst.  In the course of two conversations, Keller denied sending PurchasePro a recent letter and asked to see a copy of the April 19 correspondence.[31]  Scott Wiegand immediately went through the Company's files and pulled all documents that bore Keller's signature.  These documents (which also included the April 23 letter and the second SOW) were faxed to AOL's general counsel and its Chief Financial Officer, Joe Ripp.  Eric Keller thereafter stopped returning McGhee's calls and responding to his faxes and e-mails.

After the first call with Eric Keller cast doubt on the authenticity of his letters, Wiegand and McGhee instituted an immediate reexamination of all PurchasePro revenue, dividing it into "buckets" of good revenue and questionable revenue.  They then held meetings with senior management to verify each

---

[31]McGhee asked Sholeff whether he knew anything about forged documents.  His tone was accusatory enough that Sholeff called Junior right away.  Junior told him to stick to the story that PurchasePro had made its quarter.  He also reassured Sholeff "that no one would be coming after [him] because [he] was just wallpaper when all this stuff was happening at AOL."  (Tr. 647).

individual transaction.  Junior attended at least one of these meetings[32] and became increasingly agitated as revenue was deferred or discarded.  He claimed that AOL was "screwing" PurchasePro by booking certain transactions inconsistently.  (Tr. 1265).  When the revenue review reached the subject of the second SOW, Junior was adamant that the revenue be recognized.  As McGhee recalls the meeting, Junior "said he knew that it was good revenue."  (Tr. 1264-65).

As noted above, PurchasePro was scheduled to release its earnings on the morning of Wednesday, April 25.  However, the revenue reexamination process caused by McGhee's calls to Eric Keller was taking so long that it could not be completed on this schedule.  On the morning of April 25, PurchasePro put out a press release announcing that it would delay until the end of the day any announcement of its Q1 results, and that the results would not meet Wall Street's expectations.  (GX-16).  At the end of the day, PurchasePro issued another press release saying that its Q1 results would now be disclosed on the morning of Thursday, April 26. (GX-15).

---

[32]Junior was not in the office when the Bagel Cafe scheme began to unravel, and he refused to respond to telephone calls and e-mails.  McGhee sent Layne to Junior's house to bring him to the office.  (Tr. 1264).  Junior would not answer the door, so Layne reached through a dog door to let himself in.  He went to Junior's bedroom on the second floor and pounded on the door until Junior opened it.  In Layne's words, "he looked like he had a rough time."  (Tr. 1002).  Layne convinced him to come to the office by saying that Junior owed it to the people working at PurchasePro.

At 7:15 am (PST) on the morning of April 26, PurchasePro held a dial-in conference call for investors, analysts and other interested parties.[33]  During that call (GX-5) and in the accompanying press release (GX-18), PurchasePro claimed that it had earned $29.8 million.  This was down 30% from the $42.5 million that the Company predicted in its March 7 earnings forecast.  Management claimed during that the conference call that the "miss" occurred because certain items of revenue had been deferred out of an abundance of caution.

Even though Wiegand and McGhee had tried hard to scrub the revenue that PurchasePro reported to the investing public, certain deceptions had gotten through the net.  Among other items, PurchasePro falsely claimed to have earned $3.7 million pursuant to the second SOW and $9 million from the sale of bulk subscriptions to AOL in Q1.  The truth about these items of revenue would come out in mid-May, and the results would be devastating.

## F.   **The Heller Ehrman Investigation**

Shawn McGhee's decision to delay the earnings announcement

---

[33]Investors from all over the country could dial into the conference call or stream it over the internet.  Mark Wovsaniker, AOL's Vice-President of Accounting Policy, was charged with monitoring AOL's investment in PurchasePro.  He listened to the call from his office in Dulles, Virginia.  (Tr. 1592).  He thereafter downloaded from the internet PurchasePro's earnings announcement press release.  (Tr. 1593).

and report sharply lower revenue numbers the following day was the only legally viable response to the situation he faced, but it caused a firestorm.  Investors, analysts and short sellers besieged PurchasePro's offices with calls.  (Tr. 1279).  The stock dropped from $6.22 on April 24 to $2.810 on April 30, shaving another $36.4 million off Junior's dwindling net worth. Credit Suisse decided to sell another one million of Junior's shares on April 27 and 30.  Finally, PurchasePro was hit with over twenty class action lawsuits, each of which alleged that the Company defrauded investors by issuing false and misleading earnings forecasts.  (Id.)

Scott Wiegand recommended that PurchasePro's Board of Directors form a Special Committee to investigate the earnings shortfall and suspected falsifications.  (GX-40).  At a meeting held on May 3, 2001, the Board adopted this suggestion (GX-41),[34] and the Special Committee hired the San Francisco-based law firm Heller Ehrman to act as its counsel.  Two Heller Ehrman partners, Charles Jaeger, Esquire and Mike Rugen, Esquire, were dispatched to Las Vegas to meet with Scott Wiegand, gather documents and interview relevant PurchasePro executives.

Jaeger and Rugen interviewed Layne and Sholeff on Monday, May 14.  The two PurchasePro executives met with Junior at his house before their interviews to coordinate testimony.  Junior

_____

[34]Junior spoke in favor of forming the Special Committee. (Tr. 1468).

told them to "stick to the story, not admit anything and say that PurchasePro made its quarter."  (Tr. 648, 1004).  As Layne described it, "a pact was made to keep our stories straight that we didn't do anything wrong."  (Tr. 1005).

Layne remembered his interview with the attorneys as being "accusatory" and "stressful."  The Heller Ehrman attorneys confronted him with computer records that documented his alterations of the second SOW.  They told Layne that now was the time to come clean, but he calmly denied altering any documents. He became emotional at the end of the interview, however, when talking about his devastated finances and the effect on his family.

The Heller Ehrman attorneys interviewed Sholeff later that same day.  He impressed the attorneys as young, inexperienced and unsophisticated about financial affairs.  Sholeff denied participating in any document falsifications, but testified that it "seemed like [Heller Ehrman] had figured out most of what had happened.  They were asking, to me, all the right questions as if they knew what had happened, contrary to what Junior had told me. They basically said that there was a big fraud going on, and they wanted to know what I knew about it."  (Tr. 649).  Sholeff repeatedly took breaks from the interview to go outside and make calls on his cell phone.  The calls lasted almost the entire break.

Sholeff debriefed Junior afterwards.  Junior wanted to know exactly what the Heller Ehrman lawyers had asked.  (Tr. 649). Sholeff told Junior how accusatory and uncomfortable the interview has been.  Junior advised Sholeff to go on the offensive and file a complaint against the attorneys with PurchasePro's Human Resources department.  (Tr. 650-51).  Sholeff did so verbally.  Layne and Junior authored written complaints. (GX-2306, DX-1553).

Jaeger and Rugen interviewed Junior the next day (Tuesday, May 15).  Junior told them that he did not see the marketplace license contracts, but had been told that they were all signed by the end of the month.  He also stated that he did not know much about the AuctionNet related revenue and only first heard about the second SOW on Friday, April 20.  Finally, Junior admitted receiving Eric Keller's April 5 letter regarding application of the $12.2 million check, but claimed that he disagreed with its contents and left it at the AOL offices.  (Tr. 1500-01).  While he talked with the Heller Ehrman attorneys, Junior looked at his Blackberry repeatedly to answer questions by referring to Q1 e-mails.[35]

During the course of his May 15 interview with Jaeger and Rugen, Junior received an e-mail which stated that Arthur

---

[35]Several days after Junior's interview, the Heller Ehrman attorneys asked him to produce his Blackberry for inspection. Junior told them that the Blackberry was missing.  (Tr. 1508).

Andersen was going to postpone its approval of PurchasePro's 10Q
for the first quarter.  His immediate reaction was to blame
Heller Ehrman, stating "You guys just fucked us."  (Tr. 1505,
1531).  What Junior apparently did not know was that Shawn McGhee
and Arthur Andersen had received a letter dated May 14, 2001 from
Joe Ripp, AOL's Chief Financial Officer. (GX-1834).  The letter
stated that Eric Keller never sent his purported letter of April
19, that the Amendment to the Bulk Subscription Agreement was not
signed until April 5 (after the first quarter) and that AOL had
no record of any obligation to pay PurchasePro $3.7 million
pursuant to the AuctionNet SOW.  In his trial testimony, Shawn
McGhee described the effect of the Ripp letter in apocalyptic
terms.

> Q:   Mr. McGhee, what was your reaction when you
>      received this letter?
>
> A:   Illness.  It was kind of world-ending.
>
> Q:   What do you mean by that?
>
> A:   You know, up to that point you had held out hope
>      that AOL would -- you'd kind of stop the bleeding
>      at that point, you'd taken the number down to 29
>      and change.  And we knew what the storm was up to
>      that point.  This letter increased the storm
>      significantly.
>
> Q:   Was it your understanding that the company would
>      have to revise its revenue figures for Q1 even
>      further downward?
>
> A:   Yes.  Substantially.

(Tr. 1281-82).  Arthur Andersen subsequently issued a section

10(a) letter which put PurchasePro on formal notice that a fraud likely had occurred. (GX-42, 1836).

A couple of days after his interview, Junior showed up unannounced at the law offices in Las Vegas where the Heller Ehrman attorneys were working.  He angrily accused the attorneys of being overly aggressive with Layne and Sholeff.  Things became quite heated between Junior and Rugen.  Jaeger had to separate the two men and escort Junior out the door.  (Tr. 1510).  Junior later told Layne that, "he [Junior] got in their face and there was sort of a verbal and a confrontation at that time."  (Tr. 1006).

The tension at PurchasePro increased further once the existence of the server back-up tapes became public late in the week.  As discussed above, Junior had instructed Ed Kim and Jim Sholeff in early April to delete certain e-mails from PurchasePro's server.  Junior apparently did not realize that this e-mail traffic had been preserved on the back-up tapes that PurchasePro's IT Department routinely maintained.  Attorneys Jaeger and Rugen learned of these back-up tapes in the course of their interviews and demanded to see them.  Junior learned of the back-up tapes at roughly the same time and tried to block their disclosure.

On the afternoon of Friday, May 18, Junior called Dave Hisaw, PurchasePro's Vice-President of IT Operations.  Junior

asked about the details of PurchasePro's e-mail system and back-
up tapes.  (Tr. 1787).  Mr. Hisaw knew of the Special Committee
and feared that Junior's call related to its investigation, so he
immediately informed Mike Kennedy.  Kennedy and Todd Morrisette,
grabbed the relevant back-up tapes and left the PurchasePro
campus to secure the tapes at Morrisette's house.  Shortly after
they left, Junior appeared in Mr. Hisaw's office.[36]  This was
highly unusual because PurchasePro's IT Department was located in
a separate building approximately 150 yards from the main
building, and Junior rarely visited.  Junior asked Mr. Hisaw the
same questions that he previously had asked on the telephone and
demanded to see the back-up tapes.  (Tr. 1790).  Mr. Hisaw took
him to the locked cabinet where the tapes normally were stored,
but did not tell Junior that they had just been removed.  Junior
yanked on the cabinet's handles to make sure they were securely
locked and left.  (Tr. 1791).

Junior subsequently contacted Mike Kennedy.  Mr. Kennedy
falsely told him that the back-up tapes were in the safe.  Junior
instructed Mr. Kennedy to not deliver the tapes to Heller Ehrman.
This caused Mr. Kennedy to send an e-mail to the Special
Committee, the attorneys and PurchasePro's management asking

---

[36]Before he went to Mr. Hisaw's office, Junior encountered a
network engineer named Bob Bermingham in the data center
building.  Junior was agitated.  He wanted to know where the back
up tapes were located and how he could gain access to them.  (Tr.
1804-05).

which conflicting direction he should follow--Junior's or Heller

Ehrman's.  (GX-2222).  Junior backed down after the Chair of the

Special Committee directed that the tapes be produced.  Bob

Bermingham couriered the tapes to San Francisco and spent the

next two weeks attempting to extract the e-mail traffic of

certain individuals.  (GX-2223; DX-909; Tr. 1562, 1805-06).

PurchasePro's Board met on Sunday, May 20 to hear the report

of the Special Committee and its counsel.  Upon conclusion of the

meeting, the Board adopted the Special Committee's recommendation

to terminate Junior's employment and place Layne and Sholeff on

paid administrative leave.  (GX-45).

Junior resigned as a director of the Company after being

terminated as CEO, but he did not leave PurchasePro without

taking a couple of parting shots.  On Monday, May 21, he stopped

by Ed Kim's office to say "I want you to know that you're one of

the guys who fucked me--you, McGhee and Wiegand.  Every dog has

his day, and I've got nothing but time now.  I'll get you back

someday for what you did to me, and you'll never know when.  I

want you to think about that every day."  (GX-732).  Junior then

sent a scathing e-mail to Dave Hisaw and Todd Morrisette, calling

them "Judas" and "Benedict Arnold" for not volunteering that the

back-up tapes had been removed from the vault.  (GX-2234).  Todd

Morrisette was so unnerved by the veiled threats in Junior's e-

mail that he immediately left Las Vegas and drove his family to

Phoenix, where his wife had relatives.  PurchasePro's IT
Department ended up blocking all of Junior's in-bound e-mails.
(GX-734).

PurchasePro ultimately filed its first quarter 10Q on
Tuesday, May 29.  The filing reported $16,028,593 in revenue.
This was $13,750,075 less than the revenue number announced to
the public on April 26.  The 10Q did not claim revenue from AOL
bulk subscriptions ($9 million), the AuctionNet SOW ($3.7
million), and Bigstep ($1.1 million).  Despite Arthur Andersen's
efforts, however, the 10Q still contained $7.64 million in
allegedly improper revenue.  The United States contends that
PurchasePro should not have claimed revenue from China.com ($3.7
million), and YellowBrix ($440,000), among others, because these
contracts were signed after the quarter ended and/or involved
secret side deals.

Shawn McGhee resigned as President of PurchasePro in June
2001 and was succeeded by an executive recruited from outside the
Company.  PurchasePro's fortunes did not improve under the new
management team, and the Company filed for bankruptcy in 2002.
Hilton Hotels bought PurchasePro's marketplace computer programs
and still uses them today for its procurement needs.

## G.   **The SEC Investigation**

After leaving PurchasePro, Junior, Layne and Sholeff took a

few months off.  Junior and Sholeff played a lot of golf.  Goeff
Layne's wife gave birth to twins in July 2001.  All the while,
the three men discussed going into business together.  In the
fall of 2001, they formed a multilevel marketing company called
Nexx to sell residential telephone service.  Junior put up most
of the money.[37]  Layne invested $100,000 that he borrowed from a
local bank.

In addition to working together at Nexx, the three men
remained interconnected financially.  Junior paid Layne and
Sholeff severance out of the termination payment he received from
PurchasePro.  Sholeff had never repaid the $250,000 that Junior
loaned him in March 2001 to avoid a margin call.  Junior loaned
Layne $100,000 in late 2001 and arranged for him to borrow
additional sums from Nexx in 2002.  None of these loans were
repaid.

Even though they had left PurchasePro and were building a
new business together, the events of the first quarter remained a
source of concern.  The Securities Exchange Commission ("SEC")
had begun an investigation into PurchasePro's Q1 fiasco.  Junior
was worried enough to comment to Sholeff that the terrorist
attacks of September 11, 2001 would help them because no one
would care any longer about PurchasePro.  (Tr. 653).

---

[37]John Chiles also invested in Nexx.  Before doing so,
however, he traveled to Las Vegas to discuss with Junior the
events of Q1.  Junior emphatically denied all allegations of
wrongdoing made by Heller Ehrman.  (Tr. 1413).

It did not work out that way.  When the SEC subpoenaed Layne[38] and Sholeff in September 2001 to produce documents and give testimony, Junior arranged for the law firm that was representing him in the SEC investigation to represent Layne and Sholeff as well.  The attorneys were not aware of any conflict of interest at this point because Junior, Layne and Sholeff all told the same story.

Before testifying before the SEC, Layne and Sholeff met with Junior to go over their answers to likely questions.  Junior told them to deny any accusation of forgery, do not admit destroying evidence, and to "stick to the story."  (Tr. 658, 1012).  Junior told Sholeff in particular to say that he left behind in AOL's offices the two April 5, 2001 letters that Eric Keller handed to him.  (Tr. 658).  Junior also directed him to say that Junior filled out the stub to Check No. 14809 in New York at the same time that he wrote the check.  (Id.)  Finally, if the SEC asked about Junior's call to John Chiles during the flight home to Las

---

[38]Layne was irate when he received the SEC subpoena.  He and Sholeff called Junior in Hawaii.  As Sholeff recalls the telephone conversation:

> Junior tried to reassure him saying that -- said things like, if you stick to your story no one will ever find out what happened, they can't prove anything, don't worry about it, just keep your story straight, no one else will be able to keep their story straight like I will be able to, don't you worry about it, I'll take care of it, don't worry.

(Tr. 655).

Vegas, Sholeff was to say that it was a ruse Junior used to determine whether Chiles was "loyal." (Tr. 657.)

Sholeff, Layne and Junior testified before the SEC in depositions given on February 22, February 26 and March 12, respectively. As agreed, they denied altering the second SOW or forging any signatures. Before Junior testified, Sholeff and Layne briefed him on the exact questions that the SEC attorneys had asked them. (Tr. 659, 1013).

In early 2003, Layne decided to leave Nexx and move back to Kentucky. Sholeff remembers that Junior opposed the move because he feared that Layne would not be able to bear the pressure alone. Junior told Sholeff that if Layne started telling the truth, Junior would blame the whole scheme on Layne. (Tr. 660). Junior looked Sholeff straight in the eye when he said this, and Sholeff took it as a threat of what would happen to him (Sholeff) if he did not stick to the story. (Tr. 661).

## H.   <u>The Criminal Investigation and Indictment</u>

Things got even more serious in 2003 when the trio learned that the United States Attorney for the Eastern District of Virginia had opened an investigation into possible securities fraud at AOL, including its dealings with PurchasePro. After

learning of guilty pleas by Jeff Anderson and Scott Miller,[39]
Sholeff hired acclaimed criminal defense attorney Plato Cacheris
to represent him.  Sholeff thereafter decided to cooperate with
prosecutors.  He ultimately pled guilty to one count of perjury
in February 2004.

Sholeff's cooperation prompted Layne to move in the same
direction.  In December 2003, Layne came to Alexandria, Virginia
for a proffer session with prosecutors and FBI agents.  Layne
admitted making side deals with Bigstep and YellowBrix, but
denied forging any documents.  The prosecutors did not believe
him and withdrew a proposed deal whereby Layne would plead guilty
to a crime with a maximum punishment of five years.  Any new deal
would now require a plea to a crime with a ten-year statutory
maximum.  Layne accepted the new deal and told the prosecutors
everything in January 2004.  He pled guilty to securities fraud
in January 2005.

Armed with the cooperation of Layne, Sholeff, Anderson,
Miller and others, the prosecutors pressed their criminal
investigation to a conclusion.  On January 10, 2005, a Grand Jury
sitting in the Eastern District of Virginia indicted Junior
Johnson, Mike Kennedy, Chris Benyo (PurchasePro's Senior Vice-

---

[39]When Junior heard about Scott Miller's guilty plea, he
dismissed its significance, saying that Miller had experienced a
"Mormon moment."  (Tr. 662).  Junior continued to tell Layne and
Sholeff to stick to the story and not incriminate themselves or
him.  (Tr. 1014-15).

President of Marketing), Kent Wakeford of AOL, John Tuli of AOL and, incredibly, Scott Wiegand--the lawyer whose persistence uncovered the fraud in the first place.  The voluminous Indictment alleged that the defendants were part of a wide ranging conspiracy to defraud PurchasePro's investors by manipulating Q1 results and then lying about their actions.  The number of documents involved in the case was massive.  The parties created a shared computer base that contained many millions of pages of images.  Producing, organizing and digesting this volume of information took the attorneys an enormous amount of time and caused the Court to waive application of the Speedy Trial Act.

The Court severed the case against Scott Wiegand and acquitted him of all counts in a bench trial held in December 2005.  At the United States's request, the Court also severed and stayed the case against Mike Kennedy.  The United States went to trial against Junior, Benyo, Wakeford and Tuli in September 2006. Approximately four months later, on February 6, 2007, the jury acquitted Benyo, Wakeford and Tuli of all charges against them.[40] As noted above and discussed in detail below, the Court declared a mistrial as to Junior and dismissed him from the case on November 9, 2006.

_____

[40]The United States voluntarily dismissed the criminal charges against Mr. Kennedy after a jury acquitted Benyo, Wakford and Tuli.

## I.   **Trial and Mistrial**

Junior was represented throughout the criminal investigation by Preston M. Burton, Esquire, a well-known and highly regarded former Assistant United States Attorney.[41]   Mr. Burton was paid by the company that underwrote PurchasePro's Director and Officer insurance coverage.   Once Junior was indicted, however, Mr. Burton's law firm and the insurance carrier were unable to agree on the financial terms of Junior's trial representation.   Junior and the insurance carrier thereafter retained other counsel.

For reasons that are not disclosed in the record, Junior re-retained Mr. Burton in January 2006.   Mr. Burton had moved to Orrick, Herrington & Sutcliffe by this time, and the Orrick firm and the insurance carrier were able to reach a financial accord. With the trial only months away, Mr. Burton and the associate working with him on the case, Bree Murphy, Esquire, scrambled to digest the massive amounts of information that had been produced by that point.   One of the major issues they had to address was the allegation that Junior had ordered the destruction of e-mails.   Junior vigorously disputed this charge, claiming that most, if not all, of the allegedly destroyed e-mails were preserved on his Blackberry.   Over the course of eight months, Junior sent Ms. Murphy five different memory sticks that

---

[41]Coincidentally, Mr. Burton had once practiced law with Plato Cacheris, one of the attorneys who represented Jim Sholeff.

contained Junior's e-mails.

Mr. Burton and Ms. Murphy anticipated that the United States would challenge the authenticity of the e-mails that Junior claimed to have saved. They therefore hired a computer forensic analyst to examine the e-mails retrieved from Junior's Blackberry. Because the expert did not alert them to any problems, Mr. Burton was shocked when Junior asked in August 2006 whether the expert had found the e-mail Junior had fabricated and included in his memory sticks. Junior first claimed that he was trying to test the expert's abilities. (Burton Tr. 12-13, 16). He then claimed that he had included the fabricated e-mail to test whether Mr. Burton and his team were reviewing the evidence closely. (Burton Tr. 12, 14, 16). Mr. Burton testified that he became concerned about Junior's honesty at that point, but felt he could continue the representation because Junior promised that there were no more altered documents. (Burton Tr. 17; Tr. 847, 849). However, the lawyers put into place additional document authenticity safeguards.

Approximately one month later, on September 17, 2006, Ms. Murphy was reviewing documents for inclusion on the trial exhibit list. She found a March 29, 2001 e-mail from Junior to Kent Wakeford about AOL's commission rate that seemed oddly exculpatory. When she searched the shared database, she found the same e-mail without the exculpatory language. She sent the

following e-mail to Junior.

> [G]oing through the 2001 file, and found these e-
> mails -- the Outlook version has clearly been altered.
> Are there any more of these that I should be aware of?
> We are trying to pull the documents to be used as
> exhibits (both in our case-in-chief and for
> impeachment), and I don't want to have to ask Cecilia
> or the Temp to waste time verifying the authenticity of
> each document.
>
> Thanks -
> Bree

(GX-2247).  Ms. Murphy testified that Junior called her a few

minutes later laughing.  (Tr. 856).  He said that this altered e-

mail was a joke that he had forgotten about.  (Id.)  Once again,

Junior assured his attorneys that none of the remaining documents

had been altered.  (Id.)

Trial testimony began on October 24, 2006.  In early

November, the government advised defense counsel that it would

soon call Jeff Anderson as a witness.  The parties anticipated

that his direct examination would begin on Tuesday, November 7.

Mr. Burton and Junior met early that morning at a temporary

office located near the Courthouse to discuss Mr. Anderson's

likely testimony and topics for cross-examination.  Junior gave

Mr. Burton an outline of his thoughts on cross-examination and a

large stack of documents for use in the examination.  Mr. Burton

passed the documents along to an Orrick associate named Cecelia

Rothenberger with instructions to vet them.  Ms. Rothenberger

could not find one of Junior's documents in the shared database.

It was an e-mail and an attachment sent from Junior to Jeff Anderson dated April 2, 2001 at 2:26 pm.  Ms. Rothenberger marked the e-mail as Defense Exhibit 1443 and attached a spreadsheet that she assumed (incorrectly) belonged with it.  The e-mail portion of the exhibit said, "The other alternative is to lower AOL commissions if the balance from this weekend isn't what they promised."

Because it was so large, the shared database was difficult to search.  If the attorneys for one party or another could not find a potential exhibit in the database, they would often ask the opposing party to do its own search.  In keeping with this procedure, Ms. Rothenberger sent the following e-mail to the prosecution team at 8:00 pm on the night of November 7.

> Please take a look at the two attached exhibits. Johnson 1443 was in the database, but we could not find the attachment with it.  We have the attachment from another source, and would like to know if you have any problems with our using it.
>
> Johnson 1444 contains responses to an underlying email that we found in the database.  We could not find the later emails in the string.  Do you object to our using the currently-marked version?
>
> Thanks

(Ex. 1 to Oct. 2, 2007 Hr'g).  This communication was somewhat inaccurate in that Ms. Rothenberger had not found the e-mail component of Exhibit 1443 in the shared database.  Junior had given this e-mail to Preston Burton that morning.  After Ms. Rothenberger sent the e-mail to the prosecutors, Ms. Murphy took

the vetted and pre-marked exhibits (including Defense Exhibit 1443) to Mr. Burton's house for him to use in refining his cross-examination outline for Jeff Anderson.  Mr. Burton decided to include Defense Exhibit 1443 in his cross-examination outline.  Junior reviewed Mr. Burton's outline the next day and did not object to his use of Defense Exhibit 1443.

The next morning (Wednesday, November 8), one of the prosecutors pulled Mr. Burton aside prior to trial to advise him that the e-mail component of Defense Exhibit 1443 was an altered version of the e-mail stored in the shared database.  He added that Jeff Anderson denied sending the e-mail in its altered state and that the government would investigate further.

Mr. Burton was understandably alarmed at this development. He sent Ms. Murphy back to the office to seek guidance from Orrick's risk management attorneys.  The firm decided that it had to move to withdraw because its attorneys had become potential witnesses against their client.  Mr. Burton advised Junior of the problem and of the firm's decision during the lunch break. Junior became quite upset.  At first he denied including the e-mail marked as Defense Exhibit 1443 in the stack of Anderson documents that he gave to the attorneys and suggested that Orrick had printed out the e-mail and attachment.  (Burton Tr. 43-45). When the attorneys debunked this claim, he admitted providing the document, but said that it had been a "mistake."  (Id.)

73

Upon conclusion of the lunch break, Mr. Burton advised the Court ex parte that he had to withdraw for reasons that he could not disclose due to the attorney-client privilege. Based on Mr. Burton's reputation, the Court initially granted the motion without further inquiry and recessed the jury to assess where things stood. There ensued a major kerfuffle. The prosecutors were quite understandably concerned about a future double jeopardy claim in the event the Court declared a mistrial, and the defense attorneys were quite understandably concerned about how the jury would perceive the development. Everyone had something to say and lots of it.

The parties, their attorneys and the Court ultimately agreed to reflect on the situation overnight. Prior to the opening of Court the next day (Thursday, November 9), Junior met with Mr. Burton and Ms. Murphy. Junior was in tears and unsuccessfully pressed Mr. Burton to tell the Court that it was all an honest mistake. (Burton Tr. 46-47). He gave no explanation of how the e-mail came to be altered. (Id.)

As its first item of business that morning and out of an abundance of caution with respect to the need for a detailed record, the Court vacated its prior grant of the Motion to Withdraw. The Court directed Mr. Burton, Ms. Murphy and Junior to appear that afternoon before United States District Judge Leonie Brinkema. Judge Brinkema graciously agreed to conduct a

74

sealed hearing on the record to determine whether the withdrawal was necessary and, if so, whether Junior had caused the problem. Having a second judge make this determination avoided any possible prejudice arising from the trial judge hearing the details of Junior's attorney-client relationship. As an extra precaution, the Court appointed Ivan Davis, Esquire of the Federal Public Defender's office to represent Junior. Judge Brinkema's hearing went forward as scheduled.

Without disclosing any details, Judge Brinkema informed the Court she had found that Junior created the circumstances that led to the Motion to Withdraw and that the motion was appropriate. Based on Judge Brinkema's finding, the Court again excused Mr. Burton and his team from the case. The Court then gave Junior three options: (a) he could proceed pro se in the ongoing trial; (b) he could find a new attorney and the trial would resume in two weeks; or (c) his case could be severed and a mistrial declared. After consulting with Mr. Davis of the Federal Public Defender's office, Junior chose the third option. The Court excused him and the trial went forward with defendants Benyo, Tuli and Wakeford.

The United States Attorney's office made good on its promise to investigate the matter further. It subpoenaed Mr. Burton and Ms. Murphy to testify before a Grand Jury about the altered e-mail and the circumstances surrounding it. Junior moved to quash

the subpoena.  On January 3, 2007, Judge Brinkema heard the motion and overruled it in part, holding that the crime-fraud exception applied to waive the attorney-client privilege with respect to Defense Exhibit 1443.  In re Fed. Grand Jury Subpoenae Duces Tecum 06-4, No. 1:06dm399, Docket No. 12 (E.D. Va. Jan. 4, 2007).  The United States Court of Appeals for the Fourth Circuit affirmed her ruling.  In re Fed. Grand Jury Subpoenae Duces Tecum 06-4, No. 07-1041 (4th Cir. Aug. 8, 2007).

## II.  PRE-TRIAL MOTIONS TO DISMISS

### A.  Prosecutorial Misconduct

In his Motion to Dismiss the Indictment for Prosecutorial Misconduct (Docket No. 731), Junior attacks the constitutionality of the grand jury proceedings that precipitated his prosecution.[42]  First, Junior asks the Court to infer prosecutorial misconduct by comparing the instant case to United States v. Stein, 435 F. Supp. 2d 330 (S.D.N.Y. 2006).  In Stein, the United States District Court for the Southern District of New York held that the United States Attorney's unconstitutionally intimidated the accounting firm KPMG into abandoning its

_____

[42] Junior filed a similar Motion to Dismiss (Docket No. 559) before his previous trial.  In that Motion, he argued that the Government improperly presented irrelevant and inflammatory evidence to the Grand Jury.  The Court denied Junior's Motion in an Order dated October 16, 2006.  (Docket No. 575).

customary policy of paying legal fees for employees charged with crimes arising out their employment.  Id. at 368-69.  Junior claims that prosecutors violated his Sixth Amendment right to counsel in a similar manner, but he is uncertain of precisely how they accomplished it.  The Court rejects Junior's claim, as he bases it on conjecture alone.

Second, Junior argues that the prosecutors improperly influenced the testimony of witnesses who appeared before the grand jury.  Yet, he references only the testimony of one government witness, Samara Jaffe, who testified during the Benyo jury trial.  During her cross-examination, Ms. Jaffe described the bullying and strident interrogative tactics used by a "Senior" DOJ trial attorney named Adam Reeves.  Based solely on this testimony, Junior suggests that the Court draw a tenuous inference--that the prosecution manipulated the testimony of multiple grand jury witnesses.[43]  Ms. Jaffe's description of Mr. Reeves's attempts to manipulate her testimony was eminently believable, but she also testified that she persisted in telling the truth despite the hectoring he inflicted.  No other witness testified about prosecutorial bullying.  It is pure speculation to assert that the Grand Jury heard false testimony, much less that the prosecutors procured it.

---

[43] Junior fails to give the names of other witnesses who might have experienced, and succumbed to, pressure by the prosecution to change their testimony.

Third, Junior claims that prosecutors knowingly presented the false testimony of FBI Agent Joanne Altenburg to the Grand Jury.  Agent Altenburg mistakenly relied on an inaccurate affidavit when testifying at an evidentiary hearing on August 5, 2005.  She acknowledged and corrected the mistake during cross-examination.  On this basis, Junior presumes that the Government knowingly had Agent Altenburg give misinformed testimony before the Grand Jury in January 2005.  Yet, without proof that Agent Altenburg did in fact testify similarly before the Grand Jury some eight months earlier, the Court finds Junior's allegation meritless.

Finally, Junior claims that prosecutors failed to present exculpatory evidence to, and prohibited him from testifying before, the Grand Jury.[44]  However, the law does not require a prosecutor to present exculpatory evidence to a grand jury. United States v. Williams, 504 U.S. 36, 53 (1992).  Nor does the target of a grand jury investigation have a constitutional right

---

[44] Junior also argues that in the months preceding the grand jury's indictment, former "Deputy Attorney General Paul McNulty . . . refused to meet or speak with [him] despite [Junior's] repeated requests" to do so.  (Docket No. 1, at 1.)  In its Response (Docket No. 743, at 4), the government initially points out that Mr. McNulty did not become acting Deputy Attorney General until October 2005, ten months after the Grand Jury indicted Junior.  See Dan Eggen & Jerry Markon, Virginia Federal Prosecutor Picked for Justice Post, Wash. Post, Oct. 22, 2005, at A11.  Furthermore, the prosecutors on Junior's case met with and received correspondence from him during the pendency of the Grand Jury's investigation.  (Docket No. 743, Exs. A, B).

to testify before the grand jury.  <u>Id.</u> at 52; <u>Duke v. United States</u>, 90 F.2d 840, 841 (4th Cir.) (per curiam), <u>cert. denied</u>, 302 U.S. 685 (1937).  Nevertheless, in this case, the prosecution afforded Junior the opportunity to profess his innocence.  On the last day of the Grand Jury investigation, the prosecution played a forty-three minute videotape featuring Junior, in which he told his side of the story.  (Docket No. 743, Ex. C).  Thus, the prosecution accommodated Junior to an extent beyond that required by law.  The Court therefore **DENIES** the prosecutorial misconduct motion (Docket No. 731).

## B.    **Failure to State an Offense**

Junior also moved to dismiss Count Two of the Indictment for Failure to State an Offense.  (Docket No. 757).  In a criminal case, a motion to dismiss "tests whether the indictment sufficiently charges the offense set forth against the defendant." <u>United States v. Brandon</u>, 150 F. Supp. 2d 883, 884 (E.D. Va. 2001) (Ellis, J.) (<u>citing</u> <u>United States v. Sampson</u>, 371 U.S. 75, 78-79 (1962)).  An indictment that tracks the statutory language of the offense and provides a general description of the facts giving rise to the offense usually immunizes it from dismissal.  <u>Hamling v. United States</u>, 418 U.S. 87, 117-18 (1974) (citations omitted).  A motion to dismiss is not the proper vehicle for contesting the sufficiency of the evidence.  <u>United</u>

States v. Salman, 378 F.3d 1266, 1268 (11th Cir. 2004)
(challenging sufficiency of the evidence is accomplished via a
motion for a judgment of acquittal).

Junior contends that PurchasePro's financial team correctly
calculated the $29 million revenue figure contained in
PurchasePro's April 26, 2001 press release.  He also assails the
methodology Arthur Andersen employed to reject PurchasePro's own
assessment of its revenue.  Because the government's Indictment
presupposes the validity of Arthur Andersen's accounting
decisions, which Junior claims are inaccurate, he asks that the
Court dismiss Count Two.

Count Two of the Indictment withstands Junior's attack.
First, it tracks the language of 17 C.F.R. § 240.10b-5, which
provides the elements for securities fraud.  Second, it
identifies four representations in the press release that, if
proven false, would subject Junior to criminal liability.  The
Indictment therefore accomplishes its dual purpose.  In attacking
the accuracy of Arthur Andersen's accounting decisions, Junior
has jumped the procedural gun.  Whether PurchasePro or Arthur
Andersen accounted for PurchasePro's first quarter revenue
correctly is a factual dispute that may or may not be relevant at
the end of the day.[45]  The Court therefore **DENIES** Defendant's

---

[45]As it turns out, the wisdom of Arthur Andersen's revenue
recognition judgments is not at issue.  This case turns on
whether Junior and others misled Arthur Andersen about the true
facts surrounding certain items of claimed revenue.  Whether

Motion to Dismiss Count Two of the Indictment for Failure to State an Offense (Docket No. 757).

## C.  **Double Jeopardy**

Finally, Junior moved to dismiss the Indictment on grounds of double jeopardy (Docket No. 729).  He argues that jeopardy attached when the Court declared a mistrial as to him on November 9, 2006.  The Court rejects his motion for two reasons.  First, Junior explicitly consented to the mistrial.  Second, even assuming Junior's consent was ineffective, the Court legitimately declared a mistrial on the basis of manifest necessity.

Mr. Burton's motion to withdraw as Junior's counsel prompted four hearings--three before this Court and one before Judge Brinkema.  At an evidentiary hearing held on the afternoon of November 8, 2006, Judge Brinkema took testimony from Mr. Burton and Ms. Murphy.  She found that Junior's actions set in motion the events that created a conflict of interest and thus prevented Mr. Burton from continuing to represent Junior.  The Court adopted Judge Brinkema's finding and granted Mr. Burton's Motion to Withdraw.  It then presented Junior with three alternative courses of action: (1) he could proceed <u>pro</u> <u>se</u>; (2) the Court could adjourn for a reasonable period of time in order for Junior

---

Arthur Andersen ultimately made the right accounting decision is irrelevant.

to retain new counsel; or (3) the Court could declare a mistrial as to Junior.

Due to the complexity of the issues in his case, Junior rejected the first option.  Junior declined the second option for the same reason--no attorney could familiarize himself or herself with the facts of his case in time to resume trial within two weeks.  Then, the following exchange occurred:

> THE COURT: Let me ask you this: Would Mr. Johnson agree to the mistrial if I were to do it?
>
> MR. DAVIS: One moment, Your Honor.  He would, Your Honor.
>
> THE COURT: He would?
>
> MR. DAVIS: Yes, Your Honor.
>
> THE COURT: That certainly helps.

(Tr. of Nov. 9, 2001 Hr'g at 33).

This colloquy constitutes the first basis for denying Junior's Motion.  Because Junior explicitly "consent[ed] to the grant of a mistrial, there [was] no bar to his later retrial." Gilliam v. Foster, 75 F.3d 881, 893 (4th Cir.) (en banc), cert. denied, 517 U.S. 1220 (1996); accord United States v. Smith, 441 F.3d 254, 265 (4th Cir.), cert. denied sub nom. Reep v. United States, 127 S. Ct. 226 (2006).

Nevertheless, regardless of whether Junior consented, Mr. Burton's withdrawal manifestly necessitated a mistrial.  Whether manifest necessity exists turns on the particular facts of each

82

case.  See Illinois v. Somerville, 410 U.S. 458, 464 (1973).

Accordingly, "the determination of a trial court that a mistrial

is manifestly necessary is entitled to great deference." Sanders

v. Easley, 230 F.3d 679, 686 (4th Cir. 2000).  The Fourth Circuit

principally looks to three factors in reviewing a district

court's declaration of a mistrial: "whether the judge (1) act[ed]

precipitously . . . [or] gave both defense counsel and the

prosecutor full opportunity to explain their positions, (2)

accorded careful consideration to [the defendant's] interest in

having the trial concluded in a single proceeding, and (3)

considered alternatives to declaring a mistrial." United States

v. Sloan, 36 F.3d 386, 394 (4th Cir. 1994) (alterations in

original) (internal quotations marks and citations omitted).

      Here, the Court allowed both the United States and Junior

ample opportunity to discuss the most prudent course of action.

The prosecution urged the Court to take a week-long recess,

during which time Junior could retain new counsel.  This course

of action would have averted a mistrial, but Junior and his

attorney, Mr. Davis, insisted that a one-week recess was a

grossly insufficient period of time for an attorney to

familiarize himself or herself with Junior's case.  Conversely, a

lengthy continuance would have prejudiced the other defendants on

trial.  The Court therefore offered Junior three alternatives,

the first two of which he rejected.  After carefully considering

all possible causes of action, no course of action other than a mistrial was available.

Finally, this Court is mindful of the circumstances that led to Mr. Burton's withdrawal.  Junior created the conflict of interest by giving his counsel an altered e-mail to use in the trial.  Though no cases with analogous facts exist, it strikes the Court that a defendant would have to demonstrate extraordinary error to prevail on a motion to dismiss when he generated the grounds for the mistrial.  The Court therefore **DENIES** the double jeopardy motion (Docket No. 729).

### III.  <u>THE CRIMINAL CHARGES</u>

#### A.    <u>Count One - Conspiracy to Commit Securities Fraud</u>

Count One of the Indictment charges Junior with conspiring to commit securities fraud in violation of 18 U.S.C. § 371.[46]  It specifically alleges that, from approximately September of 2000 through December of 2003, Junior and other corporate executives from PurchasePro and AOL conspired

> a. directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, (1) to use and employ devices, schemes and artifices to defraud; (2) to make untrue statements of material fact and omit to state material facts

---

[46] Section 371 of Title 18 of the United States Code makes it a crime for two or more people to "conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose."

84

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to engage in acts, practices and courses of business which operated and would operate as a fraud and deceit in connection with the purchase and sale of PurchasePro stock, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5;

b. to make and cause to be made materially false statements in **PurchasePro's quarterly reports** filed with the SEC, in violation of Title 15, United States Code, Sections 78m(a) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13 and 240.13b2-2;

c. to maintain and cause to be maintained **false books and records of PurchasePro**, in violation of Title 15, United States Code, Sections 78m(b)(2)(A) and (B), 78m(b)(5), and 78ff; and Title 17, Code of Federal Regulations, Section 240.13b2-1;

d. to make and intend to make materially false statements **to accountants and auditors of PurchasePro**, and conceal material facts from accountants and auditors of PurchasePro, in violation of Title 15, United States Code, Sections 78m(a), 78m(b), and 78ff and Title 17, Code of Federal Regulations, Section 240.13b2-2; and

e. to devise and intend to devise a scheme and artifice to defraud PurchasePro and its shareholders, including to deprive them of the intangible right to honest services of its employees, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

(Docket No. 1 at 9-10, ¶ 2a-e) (emphasis added).

1.   **Applicable Law**

To convict Junior of Count One, the Court must find three elements beyond a reasonable doubt: "(1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the objectives, and (3) [] intent on the part of the conspirators." United States v. Tedder, 801 F.2d 1437, 1446 (4th Cir. 1986) (quoting United States v. Shoup, 608 F.2d 950, 956 (3d Cir. 1979)); see also 2 Kevin F. O'Malley et al., Federal Jury Practice and Instructions § 31.03 (5th ed. 2000) (describing elements in a similar fashion).  With regard to the third element, the defendant must have both "the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object[s] of the conspiracy." United States v. U.S. Gypsum Co., 438 U.S. 422, 443 n.20 (1978).  Though the Indictment alleges that the conspiracy had five objectives, the Court need only find that the conspirators agreed and intended to fulfill one of those objectives to convict.  See United States v. Pierce, 479 F.3d 546, 552 (8th Cir. 2007) (affirming propriety of district court's instruction that jury "must be unanimous on at least one object of the conspiracy in order to find the defendants guilty").


2.   **Analysis**

The testimony of Geoff Layne and Jim Sholeff, standing

alone, provides ample evidence of a conspiracy to defraud
investors through false books and records, misleading statements
and deception of accountants and auditors.  As recounted above,
in great detail, these two men and Junior acted in concert to
forge documents, alter identifying information on contracts
(including fax headers), backdate contracts, and then place these
documents in PurchasePro's files for the express purpose of
having the accountants and auditors rely on them to verify
claimed revenue.  The three men also misled PurchasePro's
accountants and auditors when Layne falsely certified in writing
the absence of any side deals with Monster, Bigstep and
YellowBrix and when Junior and Sholeff failed to disclose Eric
Keller's April 5 letters.

Junior asserts that Layne and Sholeff are unworthy of
belief.  It is true that they did not come before the Court with
an unblemished record of veracity.  Each lied to their fellow
PurchasePro executives, to the Heller Ehrman attorneys and to the
SEC.  Layne also lied to prosecutors and the FBI.  Both are
convicted felons as a result of the conduct described in this
Verdict and Opinion.

Despite this baggage, the Court finds both Layne and Sholeff
credible.  The Court bases its judgment not just on their
demeanor, but also on the independent evidence that corroborates
large portions of their story.  Bruce Nelson testified that

87

Junior tried to induce him to backdate documents.  Jeff Anderson testified that Junior told him that AOL had committed to deliver marketplace sales in April and that Junior asked him to sign the backdated Monster.com contract.  Junior told Ed Kim during the first week of April 2001 that the quarter does not end until he (Junior) says so.

Junior's consciousness of guilt is evidenced by his attempts to destroy e-mails, the actual destruction of other documents at his direction and alteration of evidence in this case.  Again, these acts are corroborated by witnesses in addition to Layne and Sholeff.  Ed Kim testified that Junior directed him to delete e-mails from PurchasePro's server.  Todd Morrisette confirms that he did this at Kim's direction and noted in his Day Planner the names of those whose e-mails were deleted.  Dave Hisaw and Todd Morrisette confirm that Junior tried to block Heller Ehrman from obtaining PurchasePro's back-up tapes.  Finally, it is undisputed that Junior altered at least three e-mails to make them exculpatory and gave the altered e-mails to his defense team.

It strains credulity to believe that Layne and Sholeff acted solely on their own.  PurchasePro was Junior's Company and both men had risen in the Company because of their long standing relationship with and personal loyalty to Junior.  In Layne's words, he was a "team player."  (Tr. 1197).  Layne and Sholeff were the only executives at PurchasePro (other than Junior) who

88

did not sell any stock.  They would not have taken Junior's
Company for a joy ride.  Even if they had tried, they would not
have gotten very far.  All witnesses agreed that Junior was a
very "hands-on" CEO who knew everything that occurred at the
Company.

Junior argues that he could not have participated in the
conspiracy because he took a number of inconsistent actions.  For
example, Junior tried to fire Arthur Andersen in the fall of 2000
even though he knew that the market would react negatively.  In
the first week of April, when the stock was getting badly
hammered, he refused to issue a press release stating that
PurchasePro had made its quarter even though his PR staff wanted
to do so.  The following week, he agreed with a proposal to
reduce guidance for the remainder of the year.  Reducing guidance
likely would have reduced PurchasePro's stock price.

Junior also argues that he had no motive to mislead the
auditors in order to meet Q1 expectations.  Even though the value
of his stock declined by $366 million between January 29 and
April 9, Junior still was worth more money than most people will
ever earn in a lifetime.[47]  He asserts that the precipitous
decline in PurchasePro's stock price did not affect his
lifestyle.  Moreover, he was a long-term investor in the Company,
not someone who was looking for a quick sale.  In fact, he never

---

[47]On the day Junior was fired from PurchasePro, his stock was
still worth $18.1 million.

89

willingly sold a share of PurchasePro stock.

Evidence in the record refutes the significance of each instance of inconsistent behavior.[48]  Moreover, these isolated incidents and Junior's net worth on paper stand in the shadow of the overwhelming weight of contrary evidence.  The record as a whole paints an unmistakable picture of a CEO desperate to meet the artificially high guidance that he himself set.  Far from being indifferent to the price of the stock, Junior, Layne and Sholeff talked incessantly about how the stock was doing and the absolute necessity of making the quarter.  (Tr. 573, 1198, 1203-04).  Junior sounded desperate to those with whom he talked, and he projected this state of mind into the e-mails that he sent at the end of the first quarter of 2001.  As quoted above in more detail, he told Kent Wakeford that "it would devastate this entire initiative w/o getting this quarter completed."  (GX-621). He told Eric Keller "we have to survive Q1."  (GX-752).  As time grew short, he told Bruce Nelson "there is [sic] 5 years of my life and the company at risk."  (GX-213).  When the quarter expired without success, Junior wrote Kent Wakeford, "now PPRO will be crushed and it will personally cause my world to collapse

---

[48]When Junior wanted to fire Arthur Andersen in the fall of 2000, he was not pressured by a sinking stock price and repeated margin calls.  When Junior refused to issue a reaffirming press release during the first week of April 2001, it was because PurchasePro was in an SEC mandated "quiet period."  Finally, Junior never lowered guidance for Q1.  He only agreed to future quarters and did this only after analysts made it clear that they did not believe PurchasePro's projections.

and my family...Bottom line is that if we miss everything

ultimately will hit the fan because of the significance of

warrants, dollars, and the awareness by the analysts and

media...that is why I sold my soul." (DX-305). When trying to

persuade Myer Berlow to sell Q1 deals in Q2, Junior wrote, "PPRO

and my entire financial future does depend on this, in other

words, I will be wiped out otherwise." (GX-760.1). These are

not the words of a man so secure in his wealth that he feels no

compunction to cheat.

Finally, the record belies the assertion that Junior was

unfazed by PurchasePro's plummeting stock price. Even the most

stalwart of souls would blanch at losing $366 million in less

that three months. What was worse was the fact that the stock

was in a death spiral. The more Credit Suisse sold, the more the

stock fell. The more the stock fell, the more Credit Suisse

sold. This is why Junior was so anxious to make the quarter and

why he was so anxious for PurchasePro to make him loans. He had

to break the spiral.

Based on the totality of the evidence, the Court **FINDS**

Junior **GUILTY** of Count One of the Indictment.


B.    **Count Two - Securities Fraud**

Count Two of the Indictment charges Junior with securities

fraud.[49]   It more particularly alleges that, on April 26, 2001, Junior

> cause[d] PurchasePro to issue a false and misleading press release announcing the financial results for its fiscal quarter ending March 31, 2001.  Specifically, [Junior] cause[d] PurchasePro to: (i) include revenue in the financial results reported in the press release that was based on **back-dated and forged** contracts; (ii) include revenue in the financial results reported in the press release that was based on marketplace license sales resulting from **undisclosed secret side deals**; (iii) omit to state in the press release that the secret side deals had **not been disclosed** to PurchasePro's outside auditors; and (iv) omit to state in the press release that fraudulent revenue-related entries were made **at the direction** of management.

---

[49] Count Two implicates multiple statutes and one regulation. Sections 78j(b) and 78ff of Title 15 of the United States Code make it unlawful for an individual to willfully violate any SEC rule.  Accordingly, Rule 10b-5 prohibits anyone from

> directly or indirectly [using] any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, no misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Finally, 18 U.S.C. § 2 treats as a principal any person who "willfully causes" another to commit securities fraud.

(Docket No. 1 at 33, ¶ 2) (emphasis added).

1.   **Applicable Law**

To convict Junior of securities fraud, the Court must find

four elements beyond a reasonable doubt:

> One: [Junior] knowingly either employed any device,
> scheme, or artifice to defraud . . . ; or made any
> untrue statement of a material fact, or omitted to
> state a material fact necessary in order to make the
> statements made, in the light of the circumstances
> under which they were made, not misleading . . . ; or
> engaged in a transaction, practice, or course of
> business which operated or would operate as a fraud and
> deceit on any person . . . [;]
>
> Two: [He] did so in connection with the purchase or
> sale of [] securities [;]
>
> Three: In connection with this purchase or sale [he]
> made use of or caused the use of any means or
> instrumentality of interstate commerce, or of the
> mails, or of any facility of any national securities
> exchange [;] and
>
> Four: [He willfully] acted with the intent to defraud.

2B O'Malley et al., supra, § 62.07.  A securities fraud

conviction does not depend upon the defendant's personal use of

the instrumentality of interstate commerce.  United States v.

Mackay, 491 F.2d 616, 619 (10th Cir. 1973).  As long as the

defendant "causes [the offense] to be carried out by setting

forces in motion which foreseeably result in use [of an

instrumentality], his action is sufficient."  Id.  Thus, if

Junior knowingly contributed to the scheme that ultimately led to

the publication of the April 26, 2001 press release, he committed

93

securities fraud.

## 2.   **Analysis**

The testimony of Geoff Layne and Jim Sholeff establishes beyond a reasonable doubt that Junior directed a scheme designed to defraud investors by artificially enhancing the revenue that PurchasePro announced on April 26, 2001.  PurchasePro's earnings announcement was transmitted through interstate commerce by telephone, internet and a press release distribution service. The Court therefore **FINDS** Junior **GUILTY** of Count Two of the Indictment.

## C.   **Count Twenty-Eight - Witness Tampering**

Count Twenty-Eight of the Indictment charges Junior with witness tampering on two separate occasions, in violation of 18 U.S.C. § 1512(b)(1).[50]  According to the Indictment, Junior first directed his co-conspirators, to lie under oath to the SEC about PurchasePro's activities.  In the fall of 2003, after the FBI opened a criminal investigation, Junior allegedly instructed his co-conspirators to repeat the fabricated story if interviewed by federal agents.  The Government claims that Junior's tampering

---

[50] Section 1512(b)(1) subjects to criminal liability any person who "knowingly . . . corruptly persuades another person, or attempts to do so . . . with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding."

caused a number of co-conspirators to provide false information to SEC officials and FBI agents.

## 1.  **Applicable Law**

To convict Junior of witness tampering, the Court must find two elements beyond a reasonable doubt: (1) Junior "knowingly [corruptly persuaded another] person [or attempted to do so,]" and (2) "[he] did so intending to influence, delay, or prevent the testimony of [any] person in an official proceeding."  2A O'Malley et al., supra, § 49.03.  Section 1512(b) of Title 18 of the United States Code does not define the phrase "knowingly . . . corruptly persuades."  However, in Arthur Andersen LLP v. United States, 544 U.S. 696 (2005), the Supreme Court of the United States explained the meanings of those terms:

> "Knowledge" and "knowingly" are normally associated with awareness, understanding, or consciousness. "Corrupt" and "corruptly" are normally associated with wrongful, immoral, depraved, or evil.  Joining these meanings together here makes sense linguistically and in the statutory scheme.  Only persons conscious of wrongdoing can be said to "knowingly . . . corruptly persuad[e]."

Id. at 705-06 (citations omitted).  The first element therefore is met if Junior made a conscious effort to wrongfully persuade another individual.

The term "testimony" also goes undefined, but it is commonly understood to constitute evidence given by "a competent witness under oath or affirmation."  Black's Law Dictionary 1514 (8th ed.

2004); see Bailey v. United States, 516 U.S. 137, 145 (1995)
(giving words not defined in a statute their "ordinary or
natural" meanings).  "Official proceeding" is a defined phrase.
See 18 U.S.C. § 1515(a)(1)(A), (C).  It includes, among other
things, "proceeding[s] before a Federal Government agency which
[are] authorized by law."  Id.

Finally, section 1512(b)(1) requires a "nexus" between the
obstructive act and a particular official proceeding.  See Arthur
Andersen, 544 U.S. at 707-08 (holding that section 1512(b)(2),
section 1512(b)(1)'s companion statute, requires a nexus); United
States v. Kaplan, 490 F.3d 110, 126 (2d Cir. 2007) (reading nexus
into section 1512(b)(1), based on its linguistic similarity with
section 1512(b)(2)).  This element, which reinforces the meaning
of "knowingly . . . corruptly persuades," dictates that a
defendant "must believe that his actions are likely to affect a
particular existing or foreseeable official proceeding."  Kaplan,
490 F.3d at 125.

## 2.  **Analysis**

The testimony of Geoff Layne and Jim Sholeff establishes
beyond a reasonable doubt that Junior coached them to lie in
their SEC depositions.  Both men rehearsed their false testimony
with Junior before the depositions, and he repeatedly urged them
to "stick to the story" and deny all forgeries.  Both men

testified under oath and lied as agreed.  They told Junior about their lies once the depositions were over.  The Court therefore **FINDS** Junior **GUILTY** of Count Twenty-Eight of the Indictment.[51]

### D.    Criminal Information – Obstructing an Official Proceeding

On October 9, 2007, the United States filed a Criminal Information charging Junior with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2).  The Information accuses Junior of giving Preston Burton a falsified e-mail with the intent that it be used as an exhibit during the cross-examination of a government witness.

### 1.    Junior's Explanation

In evaluating the Criminal Information, unlike the charges

---

[51]Junior is guilty of Count Twenty-Eight because he obstructed the SEC proceedings.  Yet, the prosecution has consolidated two acts within Count Twenty-Eight that, standing alone, might each constitute witness tampering.  (Docket No. 1 at 40-41, ¶ 3 (tampering related to SEC testimony), ¶ 7 (tampering related to FBI investigation)).  The Government properly grouped these acts within a single count because they represent "a single, continuing scheme." United States v. Alsobrook, 620 F.2d 139, 142 (6th Cir. 1980); see United States v. Girard, 601 F.2d 69, 72 (2d Cir. 1979) (Van Graafeiland, J.).  The Court need only find that one of the acts satisfies the elements of witness tampering to convict Junior. See Alsobrook, 620 F.2d at 143 (approving of district court instructing jury that "it must reach a unanimous decision on at least one act" to convict the defendant, where indictment alleged multiple acts in one count).  Thus, finding Junior guilty of witness tampering in the SEC proceeding obviates the need for the Court to consider the criminality of Junior's conduct in relation to the FBI's investigation.

in the Indictment, the Court has the benefit of Junior's
testimony.  He admitted altering the e-mail component of Defense
Exhibit 1443, along with three other e-mails in April 2006.
Junior testified that he became very frustrated with his
attorneys in March of that year and did not think that the
attorneys were reading the electronic documents that he sent on
memory sticks.  He testified that he altered four e-mails to
prove their inattention.  Each altered e-mail dealt with the
commission rate that PurchasePro would pay to AOL.  Junior
believed that the altered e-mails were easily identifiable as
such, because each was located right next to the real e-mail and
bore the same date and time of transmission.

     According to Junior, his attorneys did not discover the
alterations.  They came to light in August 2006 when he brought
them to Preston Burton's attention.  Junior claims that he told
Mr. Burton about all four e-mails, not just one.  He further
testified that Ms. Murphy must have forgotten about his
disclosure when she came across the altered e-mail that prompted
her to send GX-2247.  He believes that Ms. Murphy was working off
an old memory stick because he had removed the four altered e-
mails from the memory stick he sent after revealing the
alterations.

     Junior testified that he altered the e-mail component of
Defense Exhibit 1443 at the same time as the others, but it

involved a special situation.  He attached to the altered e-mail a Microsoft Excel spreadsheet (the "Work Product Spreadsheet") he created  to show his attorneys various commission rates discussed on different dates and at different times.  Junior was trying to educate his attorneys on the evolution of his decision to lower AOL's commission rate.  One of the columns in the Work Product Spreadsheet was dated April 6.  Junior believed that anyone looking at the whole of what became Defense Exhibit 1443 would know it was informational rather than evidential because April 6 was four days after the date of the cover e-mail.  He testified that he used the altered e-mail as a bookmark, _i.e._, a way of locating and accessing the Work Product Spreadsheet stored in his Anderson electronic file.

On the night of November 6, 2006, Junior printed out his entire electronic file on Jeff Anderson.  He described at trial what occurred vis-a-vis the altered e-mail.

Q:   Tell me about that.  What happened?

A:   Actually, it was given the morning of the 7th.
     I'm up at 2 o'clock in the morning printing
     everything I had in Jeff Anderson's file.  I had
     to open the e-mail to get to the attachment.  It
     inadvertently printed the e-mail.

Q:   So your version of events is you weren't feeding
     them something, you wanted them to have the
     spreadsheet, and you just happened to print the e-
     mail also?

A:   That's correct.  I printed all that stuff.  And I
     think they have my printer.  They can go back and
     look.  2 or 3 o'clock in the morning I printed

> every single thing I had in my Jeff Anderson file
> for them.  And I had to open the e-mail to get to
> the spreadsheet that I wanted him to review.

Q:    All right.  So why did you include the e-mail
      amongst the documents that you gave him?

A:    I was printing documents so fast that when I
      opened it up I must not have X'd out of it before
      I printed the spreadsheet.

(Johnson Tr. of Oct. 2, 2007 at 114).  Junior gave the printed

documents to Preston Burton on the morning of November 7.[52]  He

did not realize that the altered e-mail had printed and was in

the stack.

Two objectively verifiable facts contradict Junior's version

of events.  First, the alterations to the e-mail component of

Defense Exhibit 1443 could not have occurred only in April 2006

because prior to that date Junior had provided his defense team

with memory sticks that contained an altered version of the

disputed e-mail.  Bree Murphy testified that, at the government's

request, she examined all of the memory sticks that Junior gave

the Orrick firm.  The original, unaltered e-mail reads:

```
From:        Anderson, Jeff
Sent:        Monday, April 02, 2001 5:26 PM
To:          Johnson Jr, Charles
Subject:     RE: Spreadsheet
Attachments: AOL (Anderson).xls
```

Updated version attached --- call and I can explain.

(GX-2291).  The e-mail contained in the January 25, 2006 memory

---

[52]Junior also gave Mr. Burton an outline of points to cover
and documents to use in cross-examining Mr. Anderson.

stick was altered to add a sentence.   It reads:

        From:           Anderson, Jeff
        Sent:           Monday, April 02, 2001 2:26 PM
        To:             Johnson Jr, Charles
        Subject:        RE: Spreadsheet
        Attachments:    AOL (Anderson).xls

        Updated version attached --- call and I can explain.
        **The other alternative is to lower AOL commissions if
        the balance from this weekend isn't what they promised.**

(GX-2286,2287) (emphasis added).   The e-mail contained in the

memory stick dated March 20, 2006 is identical to the January

version.   (GX-2288, 2289).

        The e-mail contained in the May 8, 2006 memory stick that

Junior provided to the Orrick firm has been altered from the

January/March version.   The May version has a changed RE: line

and the first sentence has been deleted.   This e-mail reads:

        From:           Anderson, Jeff
        Sent:           Monday, April 02, 2001 5:26 PM
        To:             Johnson Jr, Charles
        Subject:        RE: **Commissions**
        Attachments:    AOL (Anderson).xls

        **The other alternative is to lower AOL commissions if
        the balance from this weekend isn't what they promised.**

(GX-2290) (emphasis added).   Junior obviously altered the e-mail

in April (as he has admitted), but it was not the first

alteration he had made.

        Second, the e-mail in question and the Work Product

Spreadsheet were not attached electronically.   The original e-

mail from Jeff Anderson had attached a spreadsheet that showed

PurchasePro's profitability under various scenarios.   Ms. Murphy

testified that she went to each of Junior's memory sticks and opened the attachment to every version of the altered e-mail. Every attachment opened to the original Anderson spreadsheet rather than the Work Product Spreadsheet.  Moreover, the e-mail component of Defense Exhibit 1443 bears the same icon (AOL (Anderson).xls) as the original spreadsheet to which it was attached.

Thus, contrary to Junior's claims, it was not necessary to open the e-mail to print off the Work Product Spreadsheet.  Ms. Murphy testified that the Work Product Spreadsheet was a stand alone document in the September 8, 2006 memory stick.

The memory stick dated September 8, 2006 somewhat supports Junior's claim that he removed all falsified e-mails after revealing their existence to Preston Burton and somewhat supports the United States's claim that he did not.  That memory stick contains the January/March version of the altered e-mail.  (GX-2293).  It appears that Junior removed the April alterations, but left in place the ones he made prior to that time.

### 2.   <u>Applicable Law</u>

To convict Junior of obstruction, the Court must find, that Junior "corruptly . . . obstruct[ed], influence[d], or impede[d] any official proceeding, or attempt[ed] to do so."  18 U.S.C. § 1512(c)(2).  As explained earlier, the word "corruptly" connotes

wrongfulness or impropriety.  <u>Arthur Andersen</u>, 544 U.S. at 705;

<u>see</u> <u>United States v. Matthews</u>, 505 F.3d 698, 706 (7th Cir. 2007)

(employing <u>Arthur Andersen</u> definition of "corruptly" in the

context of section 1512(c)).  Section 1512(c)(2) also

incorporates a nexus requirement.[53]  <u>United States v. Reich</u>, 479

F.3d 179, 185 (2d Cir. 2007); <u>cf.</u> <u>Matthews</u>, 505 F.3d at 708

(reading nexus requirement into section 1512(c)(1)).  A defendant

not only must commit an obstructive act "with an intent to

influence" an official proceeding, but his criminal endeavor also

must have the "'natural and probable effect' of interfering with"

that proceeding.  <u>Aguilar</u>, 515 U.S. at 599 (<u>quoting</u> <u>United States</u>

<u>v. Wood</u>, 6 F.3d 692, 695 (10th Cir. 1993)).  There must exist a

nexus "in time, causation, or logic with the judicial

proceeding[]."  <u>Id.</u>; <u>see also</u> <u>United States v. Neiswender</u>, 590

---

[53]Although the nexus requirements of section 1512(b)(1) and
section 1512(c)(2) mirror one another, they trace their lineage
to difference cases.  Section 1512(b)(1)'s nexus derives from the
<u>Arthur Andersen</u> decision.  544 U.S. at 707-08.  Section
1512(c)(2)'s nexus derives from <u>United States v. Aguilar</u>, 515
U.S. 593, 599 (1995).  <u>See</u> <u>United States v. Reich</u>, 479 F.3d 179,
185 (2d Cir. 2007).
    In <u>Aguilar</u>, the Court read a nexus requirement into the
omnibus clause of 18 U.S.C. § 1503, another obstruction statute.
515 U.S. at 599.  Based on section 1503 and section 1512(c)(2)'s
"substantially similar" language, <u>Aguilar</u>'s articulation of the
nexus requirement applies to § 1512(c)(2).  <u>See</u> <u>Reich</u>, 479 F.3d
at 186.  <u>Compare</u> 18 U.S.C. § 1503 (penalizing one who "corruptly
. . . influences, obstructs, or impedes, or endeavors to
influence, obstruct, or impede, the due administration of
justice"), <u>with</u> 18 U.S.C. § 1512(c)(2) (penalizing one who
"corruptly . . . obstructs, influences, or impedes any official
proceeding, or attempts to do so").

F.2d 1269, 1273 (4th Cir. 1979) ("[T]he defendant need only have had knowledge or notice that success in his fraud would have likely resulted in an obstruction of justice.  Notice is provided by the reasonable foresee ability of the natural and probable consequences of one's acts.").

Thus, in applying <u>Aguilar</u>'s nexus to this case, the Court must find beyond a reasonable doubt that: (1) Junior handed the falsified e-mail to Mr. Burton with the intent to wrongfully obstruct, influence, or impede his trial; and (2) it must have been foreseeable that his transmission of the e-mail to Mr. Burton would naturally and probably interfere with his trial. Junior need not have been successful in his obstructive efforts-- an "attempt[] to do so" suffices.  18 U.S.C. § 1512(c)(2).

### 3.   <u>Analysis</u>

It is easily foreseeable that giving your trial counsel an altered piece of evidence in the midst of trial naturally and probably will interfere with the trial.  Thus, the second element of the offense is met.  The more difficult question is whether Junior intended to include an altered e-mail in the stack of documents he gave to Mr. Burton and, if so, whether he included it in the hope that Mr. Burton would use it a trial.

In arguing that Junior did not have the requisite intent, his counsel observes that Junior did not reference the altered e-

mail in the cross examination outline he gave Preston Burton.
(GX-1517).  If Junior wanted the altered e-mail used, why didn't
he at least call attention to the document?  Moreover, why would
Junior want it used?  The altered e-mail was not exculpatory
because Junior took full responsibility in his SEC deposition for
the decision to change the AOL commission percentage.  Finally,
Junior himself brought the original falsification to light.  Why
would he do this if he wanted the altered e-mails used as
evidence?

Counsel raises perceptive, thought provoking questions.
However, none of the questions bolster the implausibility
inherent in Junior's explanation.  Junior could not have altered
the e-mails solely to "test" his attorneys because the January
and March memory sticks prove that the first alterations occurred
before Mr. Burton got back in the case.  The January and March
memory sticks also prove that Junior did not alter e-mails only
in April 2006.  The altered e-mail portion of Defense Exhibit
1443 could not have been printed out by accident, as Junior
claims, because the Work Product Spreadsheet was a stand alone
document.  It was not necessary to open the altered e-mail to
print out the Work Product Spreadsheet.  Moreover, it is highly
unlikely that Junior told Mr. Burton in August 2006 about all
four altered e-mails because Bree Murphy would not have reacted
the way she did in September 2006 upon discovering the second

105

alteration.  Finally, the Court finds absurd the contention that Junior relied upon a subtly altered e-mail to locate a spreadsheet that was not attached to the e-mail in the first place.

Junior was not obligated to testify in his own defense. But, once he elected to do so, he was obligated to tell the truth.  The fact that he did not is substantive evidence of guilt, <u>United States v. Williamson</u>, 339 F.3d 1295, 1301 n.14 (11th Cir. 2003), and constitutes evidence of Junior's consciousness of guilt, <u>United States v. Tenorio</u>, 360 F.3d 491, 495 (5th Cir. 2004).  The false testimony corroborates the inherently incriminating nature of his actions.  The Court therefore **FINDS** Junior **GUILTY** of the crime charged in the Criminal Information.


## IV. <u>CONCLUSION</u>


For the reasons set forth above, the Court **FINDS** and **ADJUDGES** defendant Charles E. Johnson, Jr. **GUILTY** on Counts One, Two and Twenty-Eight of the Indictment and **GUILTY** of the obstruction offense alleged in the Criminal Information.

The Clerk is **DIRECTED** to send a copy of this Verdict and Opinion to all counsel of record.


106

**IT IS SO ORDERED.**

_____/s/_____
Walter D. Kelley, Jr.
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
May 15, 2008